# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

FREDDY ALFREDO CURIEL,
Defendant and Appellant.

S272238

Fourth Appellate District, Division Three
G058604

Orange County Superior Court
02CF2160

---

November 27, 2023

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Evans concurred.

---

PEOPLE v. CURIEL

S272238

Opinion of the Court by Guerrero, C. J.

In 2006, a jury convicted Freddy Alfredo Curiel of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the gang-murder special circumstance allegation (§ 190.2, subd. (a)(22)) and the criminal street gang sentencing enhancement (§ 186.22, subd. (b)(1)). The jury also found true two firearm enhancements (§ 12022.53, subds. (d), (e)) and convicted Curiel of active participation in a criminal street gang (§ 186.22, subd. (a)). The trial court sentenced Curiel to life imprisonment without the possibility of parole, consecutive to an indeterminate term of 25 years to life in prison.

Twelve years later, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which narrowed or eliminated certain forms of accomplice liability for murder. (See Stats. 2018, ch. 1015.) Among other things, Senate Bill 1437 barred the use of the natural and probable consequences doctrine to obtain a murder conviction. (*People v. Gentile* (2020) 10 Cal.5th 830, 851 (*Gentile*).) Senate Bill 1437 also created "a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)

---

[1] Subsequent statutory references are to the Penal Code unless otherwise specified.

Curiel petitioned for relief and resentencing under this new procedure. (Former § 1170.95, subd. (a); now § 1172.6, subd. (a).) He alleged, among other things, that he had been convicted of first degree murder under the natural and probable consequences doctrine and could not currently be convicted of murder because of changes to the murder statutes enacted by Senate Bill 1437. After appointing counsel and receiving briefing, the trial court denied Curiel's petition for failure to state a prima facie case. The court believed the jury's finding that Curiel "inten[ded] to kill," which was required for the gang-murder special circumstance, refuted Curiel's allegation that he could not be convicted of murder under current law and therefore precluded relief under Senate Bill 1437. Curiel appealed, and the Court of Appeal reversed. It held that the jury's intent to kill finding was insufficient, by itself, to establish that Curiel was liable for murder under current law. For example, to be convicted as a direct aider and abettor, the prosecution would have to prove Curiel harbored a culpable mental state (mens rea) *and* he committed a culpable act (actus reus). The Court of Appeal held the jury's intent to kill finding did not demonstrate the latter as a matter of law.

We granted review to consider the effect of the jury's true finding on the gang-murder special circumstance, specifically its finding that Curiel intended to kill, on his ability to state a prima facie case for relief under Senate Bill 1437. As a threshold matter, we conclude that the jury's intent to kill finding was properly given preclusive effect in the resentencing proceedings below, i.e., Curiel was bound by the jury's finding for purposes of assessing his petition. The jury's finding satisfied the traditional elements of the doctrine of issue preclusion, and Curiel has not established any applicable

exception. (See *People v. Strong* (2022) 13 Cal.5th 698, 715–716 (*Strong*).) The trial court was therefore correct to consider whether Curiel could state a prima facie case for relief notwithstanding the jury's finding of intent to kill.

The trial court erred, however, in denying Curiel's petition at the prima facie stage based on this finding. The jury's finding of intent to kill does not, itself, conclusively establish that Curiel is ineligible for relief. Curiel's allegation that he could not currently be convicted of murder because of the changes in substantive law enacted by Senate Bill 1437 put at issue all the elements of murder under current law. Murder liability as an aider and abettor requires both a sufficient mens rea and a sufficient actus reus. A finding of intent to kill, viewed in isolation, establishes neither.

But that conclusion does not end the prima facie inquiry. The jury necessarily made other findings, which bear on Curiel's liability for murder. We discuss those findings below and conclude that they too are insufficient to rebut Curiel's allegation of nonliability and conclusively establish that he is ineligible for relief. For example, the mens rea required of a direct aider and abettor includes knowledge of the perpetrator's intent to commit an unlawful act constituting the offense and the intent to aid the perpetrator in its commission. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*).) The jury's verdicts, viewed in light of the court's jury instructions, do not show the jury necessarily made factual findings covering these elements. Thus, the trial court could not reject Curiel's prima facie showing on this basis, and it should have proceeded to an evidentiary hearing on Curiel's resentencing petition. Because the Court of Appeal likewise found that the trial court erred,

albeit on different grounds, we affirm its judgment, which reversed the trial court's order denying relief.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Trial Evidence

A group of friends, including Cesar Tejada, were socializing outside of Tejada's apartment late one night in August 2002. Two men, later identified as Curiel and Abraham Hernandez, walked past the group toward a convenience store. One person in Tejada's group, Raul R., testified at trial that Curiel and Hernandez looked at the group "in a bad manner." Curiel stipulated that he was a member of O.T.H., a criminal street gang, at the time. A prosecution gang expert testified that Hernandez was an O.T.H. member as well.

After visiting the convenience store, Curiel and Hernandez approached the group. According to recorded statements that witness Lupe O. made to police, Hernandez confronted Tejada, asked him "where he was from," and started shoving him. Raul came to Tejada's aid, but Curiel got mad and said, "this is my neighborhood." Lupe responded, "it's not your neighborhood," and Curiel became angrier. He started screaming that it was "his neighborhood" and "OTH." Hernandez and Tejada started pushing each other. At some point, Tejada grabbed Hernandez's shirt and shoved him over a shopping cart. Hernandez got up, took out a gun, and shot Tejada. Curiel and Hernandez ran away.

---

[2] Although Curiel was convicted of *first degree* murder, neither party contends the degree of Curiel's murder conviction should affect the showing necessary for Curiel to state a prima facie case or for the Attorney General to rebut it.

At trial, Lupe claimed she did not remember the events leading up to the shooting. She eventually agreed that Hernandez started an argument with Tejada, but Curiel tried to get them to calm down. Lupe said she had known Curiel for a long time, Curiel did not have anything to do with the shooting, and "he didn't want [the shooting] to happen."

Raul testified that he remembered Curiel arguing with the group of friends, telling Tejada "something about gangs or the barrio," and asking Tejada where he was from. Tejada responded, "I am from nowhere." Raul told Curiel and Hernandez to leave, and Curiel responded it was none of Raul's business, that he should "[s]hut the fuck up" and "get the hell out of here." Lupe and Curiel argued and traded insults. Hernandez pulled out a gun and chased one of the other friends. The friend ran behind Tejada, and Hernandez shot Tejada in the chest at close range. On cross-examination, Raul was confronted with earlier testimony where he stated that Hernandez, not Curiel, asked Tejada where he was from.

Tejada suffered a single gunshot wound to his upper left chest. Residue or "stippling" around the wound indicated that Tejada was shot from approximately 12 to 18 inches away. The wound was fatal.

The prosecution's gang expert testified that he had been a police officer for 24 years and specialized in gang-related crimes. He had spoken to many gang members over the years about gang culture, the expectations of gang members, and concepts like "backup and payback and respect and loyalty" in a gang. The gang expert testified that gangs can be organized around a race or ethnicity and they can be "turf-oriented" or "non[-]turf-oriented." In his experience, most Hispanic gangs were "turf-

oriented," meaning that they held a particular neighborhood or claimed a particular area. The gang expert explained that asking "where are you from" is a serious challenge or "hit-up." He said, "If it is in your particular gang neighborhood and you see somebody else there, you are trying to identify them to see what they are doing . . . ." The gang expert testified that he had investigated fatal stabbings and shootings that resulted from statements like "where are you from."

The gang expert further testified about the importance of "respect" in gang culture, which in reality means "fear and intimidation." For example, "[t]he more violent an individual is, the more respect he has within the gang and the more fear that he produces in the community." If a community member tells a gang member to leave or says "you don't live here," the gang member will probably react violently. The gang expert explained that a gang member is expected to provide "backup" for fellow gang members who commit crimes, and a member may be punished for not providing sufficient backup. Guns are important in gang culture, and in the expert's experience, "if there is a gun within a group, that it is expected that everybody knows if there is a gun and who has it."

The gang expert was familiar with the O.T.H. gang, which the parties stipulated was a criminal street gang. The expert had reviewed police reports involving O.T.H., talked with other detectives about O.T.H., and spoken with O.T.H. members themselves. The gang expert testified that O.T.H. is a "turf-oriented" gang, and Tejada's apartment was within the territory claimed by the gang. In response to a hypothetical question based on the facts of this case, the expert testified that Curiel would have been expected to provide "backup" to Hernandez during the confrontation with Tejada. Moreover, in the expert's

view, Tejada's shooting was done for the benefit of or in association with a criminal street gang, and it promoted and assisted the criminal conduct of a gang. The expert explained, "[T]hese two individuals doing the hit-up on that other individual are promoting their particular gang in trying to push him out of that area by challenging him. You know, 'where are you from?'" The shooting "elevates their status because they were willing to work, do the work for the gang, promote the gang, and act in a violent manner against somebody who would disrespect that particular gang." Yelling the name of the gang during the shooting would "promote that particular gang so that the witnesses hear that and they know who is doing it. They know what gang it is and who is responsible for that violent act."

On cross-examination, the gang expert acknowledged that gang members commit crimes that are not for the benefit of a gang, and it is "not uncommon" for them to do so. Every shooting by a gang member is not necessarily gang related. Moreover, gang members do not constantly commit crimes. They live in a neighborhood, they have jobs and families, and they interact with non-gang members without incident.

Curiel testified in his own defense. He said he had only seen Hernandez twice before the night of the shooting. Hernandez arrived at the house where Curiel was hanging out, and about 10 minutes later Curiel said he was going to the convenience store. Hernandez asked if he could come along. On the way to the store, Curiel saw Tejada's group of friends. Hernandez asked who they were, and Curiel said they lived in the neighborhood. On the way back, Hernandez walked away from Curiel and toward the group. Hernandez approached Tejada and said something that Curiel could not hear. Curiel followed and started speaking with Lupe. Curiel heard Tejada

7

tell Hernandez "you are making the area hot" and "you can't come around here." Raul told both Hernandez and Curiel to leave. Curiel told Raul to calm down. Tejada shoved Hernandez, who tripped over something behind him. Hernandez got back up and shot Tejada "real quick." Curiel was surprised; he did not know Hernandez was armed. Curiel ran away.

Curiel said that, after he and Hernandez were arrested and in custody, he told Hernandez he was mad and angry. But Curiel did not "want to hold a grudge against him," and they started writing back and forth. In one letter, Curiel wrote, "You are a good dude with a lot of *cora* and a good head on your shoulders, but with too much damn [pride]." In another, Curiel wished Hernandez a happy birthday: "I know it is on the 27th, but it is all good. I will be the first to congratulate you." In closing, Curiel wrote, "And keep your head up all day every day. Free like O.J. Much respect, F. Curiel."

In a letter to another friend, Curiel talked about communicating in code and mentioned Lupe: "Let me know when you write about Lupe, what she says, but just change her name to . . . Eva and I will know who you are talking about." Later, Curiel reminded the friend, "Please do all the above for me" and "especially talk to Lupe aka Eva." Curiel signed the letter with his gang moniker and wrote "O.T.H."

Curiel testified, "I wanted [the friend] to go and talk to [Lupe] because I don't know if she — if she understood what I was facing. And considering what she told the police that day, I — I knew she was lying . . . ." Curiel explained that he wanted to use the name "Eva" because he did not want the prosecutor to think he was threatening Lupe if the letter were intercepted.

Curiel denied threatening Lupe or directing anyone else to threaten her.

Several months before Tejada was killed, Curiel went with an accomplice nicknamed "Troubles" to steal shoes from a business. Curiel went inside, took some shoes, and ran away. A security guard pursued Curiel, and his accomplice slashed at the guard with a knife. The accomplice fled; Curiel was arrested. He pleaded guilty to theft and aiding and abetting an assault with a knife. Curiel claimed he did not know the real name of his accomplice.

### B. Closing Arguments and Jury Instructions

In closing arguments, prior to the court's jury instructions, the prosecutor contended that Curiel had instigated the confrontation with Tejada and his friends. He said Curiel "did the hit-up and he was there for backup." The prosecutor maintained that Curiel directly aided and abetted Tejada's murder and was also guilty under the natural and probable consequences doctrine. He argued that Curiel acted with both express malice (intent to kill) and implied malice. For the latter, the prosecutor said Curiel committed acts that were dangerous to human life, such as confronting Tejada and acting as backup for Hernandez, and he consciously disregarded the danger to life. The prosecutor also specifically discussed the gang-murder special circumstance. He explained, "To prove that this special circumstance is true, the People must prove that, one, the defendant intended to kill. [¶] Remember, we talked about for both special circumstance[s] you can find the defendant guilty of first degree murder. That doesn't automatically make the special circumstance true. You have to also determine if I prove to you beyond a reasonable doubt that he had the intent to kill."

Defense counsel emphasized that Curiel was not the shooter. He went on, "And it is really important that, you know, we are clear on what [the prosecutor] has to prove with the specific intents and all the mental states to go through. And it is very complicated, because my client is not — you have to crawl into his head. You have to try to figure out whether or not [the prosecutor] has proven those mental states beyond a reasonable doubt." Among other things, defense counsel noted that Curiel had "to know that Hernandez . . . intended to commit a crime, okay? And he has to know and has to be proven that my client knew Hernandez's unlawful purpose. And the fact that he is just simply present does not make him an aider and abettor." Defense counsel accused Raul of lying when he said Curiel asked Tejada, "where are you from?" Defense counsel said Raul had previously attributed this statement to Hernandez, but he had changed his testimony for Curiel's trial. Defense counsel also criticized the prosecution's gang expert based on his lack of any academic qualifications and his "junk expertise." Defense counsel disagreed that "all the guys that they think are gang members . . . all behave the same way." He attacked as "nonsense" the idea that "[i]f one gang member has a gun, they all know he has a gun."

In its jury instructions, the court identified Hernandez as the alleged perpetrator of Tejada's murder. It continued, "A person is equally guilty of the crime whether he committed it personally or aided and abetted or conspired with a perpetrator who committed it. Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

For the theory of direct aiding and abetting, the trial court instructed the jury as follows: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [1] the perpetrator committed the crime; [2] the defendant knew that the perpetrator intended to commit the crime; [3] before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and [4] the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to and does, in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime."

The trial court also instructed the jury on aiding and abetting based on the doctrine of natural and probable consequences: "To prove that the defendant is guilty of murder under the theory of aiding and abetting [based on] natural and probable consequences, the People must prove beyond a reasonable doubt that [1] the defendant is guilty of disturbing the peace or of carrying a concealed firearm by a gang member; [2] during the commission of the crime of disturbing the peace or of the crime of carrying a concealed firearm by a gang member the crime of murder was committed; and [3] under all the circumstances a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the crime of disturbing the peace or of the crime of carrying a concealed firearm by a gang member."

The court went on, "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a

consequence is natural and probable, consider all the circumstances established by the evidence. [¶] If the murder was committed for a reason independent of the common plan to commit the crime of disturbing the peace or the crime of carrying a concealed firearm by a gang member, then the commission of murder was not a natural and probable consequence of the crime of disturbing the peace. To decide whether a crime of murder was committed, please refer to the separate instructions that will be given to you on that crime."

The court also instructed the jury on the elements of disturbing the peace and carrying a concealed firearm by a gang member, as well as conspiracy liability for murder based on those crimes. The jury was told, "A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy."

For the gang-murder special circumstance allegation, the court instructed the jury as follows: "To prove that this special circumstance is true, the People must prove that: [1] the defendant intended to kill; [2] at the time of the killing the defendant was a member in a criminal street gang; and [3] the murder was carried out to further the activities of the criminal street gang."

Following deliberations, the jury convicted Curiel of first degree murder and found true the gang-murder special circumstance allegation and the criminal street gang sentencing enhancement, as described above. The trial court sentenced Curiel to life imprisonment without the possibility of parole, consecutive to an indeterminate term of 25 years to life in

prison.  The Court of Appeal affirmed the judgment in an unpublished opinion.  (*People v. Curiel* (Feb. 21, 2008, G037359) [nonpub. opn.].)

## C.  Resentencing Proceedings and Appeal

Following the enactment of Senate Bill 1437, Curiel petitioned the trial court for resentencing.  (§ 1172.6, subd. (a).)  He alleged that he had been convicted of first degree murder under the natural and probable consequences doctrine and could not currently be convicted of murder because of changes to the murder statutes enacted by Senate Bill 1437.  In response, among other arguments, the prosecution contended the jury's true finding on the gang-murder special circumstance allegation rendered Curiel ineligible for relief.  In the prosecution's view, because the gang-murder special circumstance included an element of intent to kill, the record of conviction established that Curiel acted with malice aforethought (specifically express malice) and thus he was not entitled to resentencing as a matter of law.  The trial court agreed and denied Curiel's petition.

Curiel appealed, and the Court of Appeal reversed.  (*People v. Curiel* (Nov. 4, 2021, G058604) [nonpub. opn.].)  The appellate court accepted the jury's finding of intent to kill, but it concluded the finding was insufficient to show that Curiel was ineligible for resentencing as a matter of law.  It explained, "to convict a defendant for first degree murder under the theory of direct aiding and abetting, the prosecution must prove more than just murderous intent.  In addition to proving the defendant harbored the intent to kill, the prosecution must also show the defendant actually 'aided or encouraged the commission of the murder[.]' "  The court continued, "In this case, the jury's true finding on the special circumstance

allegation did not prove this crucial additional requirement. Rather, it only satisfied the intent requirement for aiding and abetting a murder. . . . While the jury established Curiel had the mindset of a murderer, they did not prove he committed the necessary acts to subject him to murder liability under that theory of culpability." The court reversed the order denying Curiel's petition and remanded the matter for an evidentiary hearing.

The Attorney General petitioned for review, which we granted. We now address whether and under what circumstances a jury's finding of intent to kill renders a defendant who seeks relief under Senate Bill 1437 ineligible for resentencing as a matter of law.

## II. DISCUSSION

### A. Senate Bill 1437

The Legislature enacted Senate Bill 1437 "to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § 1(b).) The Legislature recognized, "It is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability." (*Id.*, § 1(d).) With this purpose in mind, Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1(f).) Outside of the felony-murder rule, "a conviction for murder requires that a person act with malice aforethought. A person's

culpability for murder must be premised upon that person's own actions and subjective mens rea." (*Id.*, § 1(g).)

Senate Bill 1437 altered the substantive law of murder in two areas. First, with certain exceptions, it narrowed the application of the felony-murder rule by adding section 189, subdivision (e) to the Penal Code. Under that provision, "A participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Second, Senate Bill 1437 imposed a new requirement that, except in cases of felony murder, "a principal in a crime shall act with malice aforethought" to be convicted of murder. (§ 188, subd. (a)(3).) "Malice shall not be imputed to a person based solely on his or her participation in a crime." (*Ibid.*) One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine. (*Gentile, supra*, 10 Cal.5th at p. 846.) "[U]nder the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense). [Citation.] A nontarget offense is the natural and probable consequence of a target offense 'if, judged

15

objectively, the [nontarget] offense was reasonably foreseeable.' [Citation.] The accomplice need not actually foresee the nontarget offense. 'Rather, liability " 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " ' " (*Id.* at pp. 843–844.) Thus, under prior law, a defendant who aided and abetted an intended assault could be liable for murder, if the murder was the natural and probable consequence of the intended assault. (*Id.* at p. 844.) The defendant need not have intended the murder or even subjectively appreciated the natural and probable consequences of the intended crime. (*Id.* at pp. 843–844.) Senate Bill 1437 ended this form of liability for murder. (*Gentile*, at p. 846.)

Senate Bill 1437 also enacted former section 1170.95, which created a procedural mechanism "for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief" where the two substantive changes described above affect a defendant's conviction. (*Gentile*, *supra*, 10 Cal.5th at p. 843.) Curiel's petition for resentencing was adjudicated under this former section. Two years later, the Legislature amended the statute to expand the population of eligible offenders, codify certain aspects of our decision in *Lewis*, and clarify the procedure and burden of proof at the evidentiary hearing stage of proceedings. (Stats. 2021, ch. 551, § 1.) One year after that, former section 1170.95 was renumbered as section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.) Because these statutory changes do not affect our consideration of the issues raised in this appeal, we refer to the current statute throughout the rest of this opinion.

Under section 1172.6, "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts . . . ." (§ 1172.6, subd. (a).)

"[T]he process begins with the filing of a petition containing a declaration that all requirements for eligibility are met ([§ 1172.6], subd. (b)(1)(A)), including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [Penal Code] Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3))." (*Strong, supra,* 13 Cal.5th at p. 708.) "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' (§ 1172.6, subd. (c); [citation].) If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. (See § 1172.6, subd. (c); [citation].) If, instead, the defendant has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' (§ 1172.6, subd. (c).)" (*Strong,* at p. 708.)

"Within 60 days after the order to show cause has issued, the court shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any

remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (d)(3).)

### B. Issue Preclusion

As noted, the trial court denied Curiel's petition at the prima facie stage based on the jury's intent to kill finding. The Court of Appeal disagreed that the intent to kill finding precluded relief, but it still treated the finding as conclusive on the issue of Curiel's intent. In this court, however, Curiel raises a more basic question: Should the jury's intent to kill finding be considered at all? Curiel believes it should not. He relies on general principles of issue preclusion to argue that the jury's finding should not impact a court's assessment of his resentencing petition, either because the traditional elements of issue preclusion have not been satisfied or, alternatively, because an equitable exception to preclusion should be applied. Curiel's argument is unpersuasive.

We recently examined the preclusive effect of a different jury finding in *Strong, supra,* 13 Cal.5th 698. There, we rejected the argument that section 1172.6 categorically prohibited the consideration of factual findings made by a jury in the defendant's underlying trial. (*Strong*, at p. 714.) We reasoned that "the structure of the statute — which permits trial courts to consult the record of conviction to determine whether the

defendant has made out a prima facie case of eligibility [citation], and which notably does not open resentencing to every previously convicted murder defendant — strongly suggests the Legislature contemplated that many, and perhaps most, such findings would be given effect on resentencing. Had the Legislature intended to permit wholesale relitigation of findings supporting murder convictions in the context of section 1172.6 resentencing, we expect it would have said so more plainly." (*Id.* at p. 715.)

Because the resentencing statute itself does not prohibit the consideration of jury findings — and in fact affirmatively contemplates it — we determined that general principles of issue preclusion informed our consideration of the effect of prior jury findings in a resentencing proceeding under section 1172.6. (*Strong, supra,* 13 Cal.5th at pp. 715–716.) Curiel therefore frames his argument in terms of issue preclusion, as does the Attorney General in response. Without deciding whether this doctrine applies wholesale to criminal resentencing proceedings generally, or even section 1172.6 proceedings specifically, we continue to believe its contours are informative in this context and rely on them again here.

"In general, whether a prior finding will be given conclusive effect in a later proceeding is governed by the doctrine of issue preclusion, also known as collateral estoppel." (*Strong, supra,* 13 Cal.5th at p. 715.) "The doctrine of collateral estoppel, or issue preclusion, is firmly embedded in both federal and California common law. It is grounded on the premise that 'once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed.' [Citation.] 'Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with

the same party or his privy and of promoting judicial economy by preventing needless litigation.' " (*Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 864, fn. omitted (*Murray*).)

"As traditionally understood and applied, issue preclusion bars relitigation of issues earlier decided 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' " (*Strong, supra,* 13 Cal.5th at p. 716.) "The party asserting collateral estoppel bears the burden of establishing these requirements." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 (*Lucido*).)

Curiel argues two of these requirements are missing: first, whether the intent to kill finding was actually litigated, and second, whether it was necessarily decided. "An issue is actually litigated '[w]hen [it] is *properly raised*, by the pleadings or otherwise, and is submitted for determination, and is *determined* . . . .' " (*People v. Sims* (1982) 32 Cal.3d 468, 484 (*Sims*), quoting Rest.2d Judgments (1982) § 27, com. d, p. 255.) An issue is necessarily decided so long as it was not " 'entirely unnecessary' to the judgment in the initial proceeding." (*Lucido, supra,* 51 Cal.3d at p. 342.) "In considering whether these criteria have been met, courts look carefully at the entire record from the prior proceeding, including the pleadings, the evidence, the jury instructions, and any special jury findings or verdicts." (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 511.)

The record here shows that Curiel's intent to kill was actually litigated and necessarily decided. The prosecution alleged the gang-murder special circumstance, which included an intent to kill element, and Curiel put all elements of the special circumstance at issue by pleading not guilty. (See *People v. Jones* (2011) 51 Cal.4th 346, 372.) The court instructed the jury it could not find the special circumstance allegation true unless it determined Curiel "intended to kill." By finding the special circumstance allegation true, the jury necessarily found beyond a reasonable doubt that Curiel intended to kill. (See Rest.2d Judgments, *supra*, § 27, com. g, pp. 257–258 ["If several issues are litigated in an action, and a judgment cannot properly be rendered in favor of one party unless all of the issues are decided in his favor, and judgment is given for him, the judgment is conclusive with respect to all the issues"].)

Curiel contends his intent to kill was not actually litigated because his counsel did not specifically address the special circumstance in closing argument. But this element of issue preclusion requires only " 'the *opportunity to litigate* . . . not whether the litigant availed himself or herself of the opportunity.' " (*Murray*, *supra*, 50 Cal.4th at p. 869; accord, *Sims*, *supra*, 32 Cal.3d at p. 484 [a party's "failure to present evidence at the hearing did not preclude the . . . issue from being 'submitted' to and 'determined' " by the trier of fact].) Curiel cites *Hardy v. America's Best Home Loans* (2014) 232 Cal.App.4th 795, 806, for the proposition that the parties in the underlying action must have " 'disputed the issue' " for it to have been actually litigated. But here, Curiel did dispute the issue by pleading not guilty, and the dispute was submitted to the jury for decision. As the authority quoted by *Hardy* itself currently goes on to explain, "The rule that collateral estoppel

applies only to those issues that were actually or fully litigated in the prior proceeding does not refer to the quality or quantity of argument or evidence addressed to an issue. . . . Issue preclusion because of a prior adjudication results from the resolution of a question in issue, not from the litigation of specific arguments directed to the issue." (50 C.J.S. (2023) Judgments, § 1014, fns. omitted.) The decision by Curiel's counsel not to specifically address the special circumstance was a matter of trial strategy, which "would no more defeat the plea of collateral estoppel than the failure of a litigant to introduce relevant available evidence in any other situation." (*Teitelbaum Furs, Inc. v. Dominion Insurance Co., Ltd.* (1962) 58 Cal.2d 601, 607.)[3]

Separately, Curiel contends the issue of his intent to kill was not necessarily decided. He points to the trial court's jury instructions on conspiracy, which told the jury that a member of a conspiracy is "criminally responsible," under certain circumstances, for the acts and statements of other members of the conspiracy. (CALCRIM former Nos. 416, 417.) But the instructions went on to explain the requirements for Curiel to

---

[3] Curiel relies on *People v. Gonzalez* (2021) 65 Cal.App.5th 420, 433, which found no actual litigation under similar circumstances. *Gonzalez* failed to appreciate that the dispositive question is a litigant's opportunity to litigate, not the litigant's actual conduct at trial. (*Murray, supra,* 50 Cal.4th at p. 869.) It was therefore incorrect to reject issue preclusion on this basis. *Gonzalez* also reasoned that issue preclusion is unavailable where the resentencing statute does not specifically identify the relevant special circumstance finding as disqualifying. (*Gonzalez,* at p. 434.) This conclusion, too, is incorrect. (See *Strong, supra,* 13 Cal.5th at pp. 714–715.) We disapprove of *People v. Gonzalez, supra,* 65 Cal.App.5th 420 on these points.

be liable for *murder* as a co-conspirator, not any special circumstance. The special circumstance instructions separately required the jury to find that Curiel intended to kill, and the prosecutor explained this requirement to the jury in closing arguments. He stated, "Remember, we talked about for both special circumstance[s] you can find the defendant guilty of first degree murder. That doesn't automatically make the special circumstance true. You have to also determine if I prove to you beyond a reasonable doubt that he had the intent to kill." By finding the special circumstance allegation true, the jury necessarily decided that Curiel intended to kill.

We therefore conclude the jury's intent to kill finding meets the traditional threshold requirements for issue preclusion. This conclusion is consistent with our observation in *Strong* that a relevant jury finding is generally preclusive in section 1172.6 proceedings, i.e., it "ordinarily establish[es] a defendant's ineligibility for resentencing under Senate Bill 1437 and thus preclude[s] the defendant from making a prima facie case for relief." (*Strong*, *supra*, 13 Cal.5th at p. 710.) Indeed, it is difficult to foresee a situation in which a relevant jury finding, embodied in a final criminal judgment, would not meet the traditional elements of issue preclusion.

However, this conclusion does not end our inquiry. "[W]hile these threshold requirements are necessary, they are not always sufficient: 'Even if the[] threshold requirements are satisfied, the doctrine will not be applied if such application would not serve its underlying fundamental principles' of promoting efficiency while ensuring fairness to the parties." (*Strong*, *supra*, 13 Cal.5th at p. 716.)

In *Strong*, we applied "one well-settled equitable exception to the general rule" of issue preclusion, which "holds that preclusion does not apply when there has been a significant change in the law since the factual findings were rendered that warrants reexamination of the issue." (*Strong, supra*, 13 Cal.5th at p. 716.) "This exception ensures basic fairness by allowing for relitigation where 'the change in the law [is] such that preclusion would result in a manifestly inequitable administration of the laws.' [Citation.] It also reflects a recognition that in the face of this sort of legal change, the equitable policies that underlie the doctrine of issue preclusion — 'preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation' [citation] — are at an ebb." (*Id.* at p. 717.)

The significant change in the law identified in *Strong* concerned the felony-murder special circumstance, specifically its requirement that an aider and abettor act "with reckless indifference to human life and as a major participant" in the underlying felony to be liable. (§ 190.2, subd. (d); *Strong, supra*, 13 Cal.5th at p. 703.) These terms were " 'derive[d] verbatim' from United States Supreme Court precedent concerning the permissible scope of capital punishment for felony murder. [Citation.] But for the next quarter century, neither the United States Supreme Court nor California courts offered much guidance about the major participant or reckless indifference standards . . . ." (*Strong*, at p. 705.) After this court provided guidance in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, we recognized that certain defendants may have been found liable for the special circumstance based on conduct that was later found insufficient.

(*In re Scoggins* (2020) 9 Cal.5th 667, 676.)  We held that such defendants were entitled to relief in habeas corpus notwithstanding the finality of their convictions.  (*Ibid*.)

Because a jury's felony-murder special-circumstance finding made before *Banks* and *Clark* carries with it a significant risk that it does not reflect a determination under the correct legal standard, *Strong* held that those decisions "represent the sort of significant change that has traditionally been thought to warrant reexamination of an earlier-litigated issue." (*Strong, supra*, 13 Cal.5th at p. 717.)  "There are many petitioners with pre-*Banks* and *Clark* felony-murder special-circumstance findings who nevertheless could not be convicted of murder today." (*Ibid*.)  It would therefore be inequitable to give preclusive effect to those findings in later resentencing proceedings under section 1172.6.  "For petitioners with pre-*Banks*/*Clark* findings, no judge or jury has ever found the currently required degree of culpability for a first time. Allowing reexamination of the issue under these circumstances does not permit 'a second bite of the apple' because the changes in the law mean there is now 'a different apple.' " (*Strong*, at p. 718.)

Curiel has not identified any similar change in the law that would justify a departure from the general rule of issue preclusion.  The intent to kill finding that was required at the time of Curiel's trial was governed by the same standards that exist today.  There has been no intervening change in the law akin to *Banks* and *Clark*.

Sidestepping the substantive law governing the finding itself, Curiel argues that other changes in the law, specifically those governing the admissibility of expert testimony, provide

sufficient support for an equitable exception to issue preclusion. He attempts to link these changes to the jury's finding of intent to kill by arguing that the jury would not have made the finding if the expert testimony at his trial had not been admitted. It does not appear that this court or any lower California court has addressed whether a change in the law governing the admissibility of evidence is sufficient to invoke an equitable exception to issue preclusion. However, even assuming that such a change could be sufficient under certain circumstances, Curiel has not justified the application of an equitable exception under the circumstances here. He has not shown there has been a significant change in the law that would have resulted in a different factual finding under the law as it exists today. (See *Strong*, *supra*, 13 Cal.5th at p. 716.)

Curiel correctly points out that this court narrowed the permissible scope of expert testimony in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). Unlike lay witnesses, experts are allowed as a matter of necessity to testify to certain matters that would otherwise be excluded as hearsay: "In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." (*Id*. at p. 675.) "The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise. '[T]he common law recognized that experts frequently acquired their knowledge from hearsay, and that "to reject a professional physician or mathematician because the fact or some facts to which he testifies are known to him only upon the authority of others would be to ignore the accepted methods of professional work

and to insist on . . . impossible standards." Thus, the common law accepted that an expert's general knowledge often came from inadmissible evidence.' " (*Id.* at p. 676.)

"By contrast, an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried. Generally, parties try to establish the facts on which their theory of the case depends by calling witnesses with personal knowledge of those case-specific facts. An expert may then testify about more generalized information to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean. The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge." (*Sanchez*, *supra*, 63 Cal.4th at p. 676.)

*Sanchez* explained, "At common law, the treatment of an expert's testimony as to general background information and case-specific hearsay differed significantly. However, the line between the two has now become blurred." (*Sanchez*, *supra*, 63 Cal.4th at p. 678.) Under the modern approach, "in support of his opinion, an expert is entitled to explain to the jury the 'matter' upon which he relied, even if that matter would ordinarily be inadmissible." (*Id.* at p. 679; see Evid. Code, §§ 801, 802.) "When that matter is hearsay, there is a question as to how much substantive detail may be given by the expert and how the jury may consider the evidence in evaluating the expert's opinion. It has long been the rule that an expert may not ' "under the guise of reasons [for an opinion] bring before the jury incompetent hearsay evidence." ' " (*Sanchez*, at p. 678.)

Prior to *Sanchez*, courts sought to avoid this hearsay issue by instructing the jury that an expert's testimony regarding the matters on which his or her opinion were based should be used only to evaluate the opinion and " 'should not be considered for their truth.' " (*Sanchez, supra,* 63 Cal.4th at p. 679, quoting *People v. Montiel* (1993) 5 Cal.4th 877, 919.) *Sanchez* found this practice untenable with respect to case-specific facts. "When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth' [citation] of the hearsay statement." (*Sanchez,* at pp. 682–683.) Thus, under *Sanchez*, "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684, fn. omitted.) A limiting instruction no longer provides justification for such case-specific hearsay testimony.

Nonetheless, an "expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests. . . . There is a distinction to be made between allowing an expert to

28

describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception." (*Sanchez*, *supra*, 63 Cal.4th at pp. 685–686.)

Thus, although *Sanchez* narrowed the scope of permissible expert testimony, it did not impact the ability of an expert to rely on hearsay evidence to reach his or her opinions, relate those opinions to the jury, and explain in general terms their bases. Nor did *Sanchez* foreclose the introduction of case-specific evidence through other means. Given this limited scope, we see no reasonable likelihood that the jury's substantive finding in this case would have been different if *Sanchez* had been the law during Curiel's trial. The change in the law effected by *Sanchez* does not support Curiel's claim that the finding should not be given preclusive effect.

Resisting this conclusion, Curiel focuses on the specific circumstances of his trial and the testimony of the prosecution's gang expert. But even assuming it is proper to consider these circumstances, Curiel has not shown it would be inequitable to give preclusive effect to the jury's intent to kill finding. To begin, Curiel appears to misunderstand the import of *Sanchez*, and he fails to substantiate his assertion that large portions of the gang expert's testimony would be inadmissible under current law. He repeatedly attacks the expert's opinion testimony as being "based on hearsay" or "founded in hearsay." But it is not improper under *Sanchez* for an expert to *consider* and *rely on* case-specific hearsay in forming his or her opinions. (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) "The limitations that *Sanchez* placed on expert testimony concern case-specific information that an expert relates to a jury, not materials upon which the expert relies." (*People v. Camacho* (2022) 14 Cal.5th 77, 128.)

Curiel also cites the expert's testimony about the characteristics of Curiel's gang, O.T.H., and the culture of criminal street gangs in general. But "general testimony about a gang's behavior, history, territory, and general operations is usually admissible. [Citation.] The same is true of the gang's name, symbols, and colors. All this background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang." (*People v. Valencia* (2021) 11 Cal.5th 818, 838.) Finally, to the extent Curiel identifies case-specific hearsay that was provided to the jury, he has not shown its inclusion justifies an equitable exception to issue preclusion. For example, the expert identified and described a letter written by Hernandez as a basis for his opinion that Hernandez was an O.T.H. gang member. But Hernandez was found to be an O.T.H. gang member following an earlier trial, where he was also found to have murdered Tejada specifically for the benefit of O.T.H. The expert therefore had ample grounds for his opinion that Hernandez was an O.T.H. gang member. His use of Hernandez's letter as additional support, even if improper under *Sanchez*, does not bear strongly on the preclusive effect of the jury's eventual verdict. The expert's opinion regarding Hernandez's gang membership would have been presented to the jury regardless of the specific admissibility of the letter, and Hernandez's gang membership was only one of many circumstances bearing on Curiel's state of mind and intent to kill. In sum, Curiel has not shown the jury would have reached a different conclusion regarding that intent if the expert's testimony about the letter had not been admitted. Put differently, the change in the law resulting from *Sanchez* would not have changed the outcome of Curiel's trial on that issue. It

is not a change "that warrants reexamination" (*Strong, supra,* 13 Cal.5th at p. 716) of the jury's intent to kill finding, even considering the specific circumstances of his underlying trial.[4]

Curiel also contends the intent to kill finding should not be given preclusive effect because he did not have an adequate incentive to litigate the issue at trial. We have recognized the relevance of "the opportunity and incentive" of a party to present

---

[4] The State Public Defender, as amicus curiae, cites *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 as another potential change in the law justifying an equitable exception to issue preclusion. We disagree. While *Sargon* emphasized the role of the trial court "as a gatekeeper to exclude speculative or irrelevant expert opinion" (*id.* at p. 770), neither the State Public Defender nor Curiel has shown *Sargon* meaningfully expanded Curiel's ability to object to the gang expert's testimony. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1213–1214 [challenges to reliability and foundation for expert testimony forfeited because they were available before *Sargon*]; see also *People v. Lucas* (2014) 60 Cal.4th 153, 245, fn. 36, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) Moreover, even looking at the specific circumstances of Curiel's trial, their criticism of the prosecution's gang expert (primarily his reliance on his general training and experience) is unpersuasive. For example, they have pointed to no evidence in the record that the expert was asked to provide more specificity regarding the bases for his opinions but could not do so.

The State Public Defender also cites changes to the substantive definition of a criminal street gang. (See § 186.22, subd. (g), as amended by Stats. 2021, ch. 699, § 4.) Whether that change applies to the gang-murder special circumstance is currently under review by this court. (See *People v. Rojas* (2022) 80 Cal.App.5th 542, 554, review granted Oct. 19, 2022, S275835.) But even assuming it applies to the definition of a criminal street gang in this context, it does not affect the substantive definition of intent to kill, so it has no bearing on the preclusive effect of the latter finding.

its position in the prior action. (*Sims, supra,* 32 Cal.3d at p. 481.) Assuming without deciding that a lack of incentive to litigate could justify an equitable exception to issue preclusion in certain situations (see, e.g., *Parklane Hosiery Co. v. Shore* (1979) 439 U.S. 322, 326), Curiel has not justified any such exception here.

Curiel had more than adequate incentive to litigate his intent to kill because, under one theory pursued by the prosecution, it was an element of the crime of murder itself. The jury was instructed that Curiel could be liable for murder as a direct perpetrator if he caused the victim's death and harbored an intent to kill. The prosecutor maintained in closing arguments that Curiel was liable under this theory because his actions — precipitating the confrontation and providing backup to Hernandez — were a substantial factor in causing the murder and because Curiel intended to kill. Curiel therefore had an incentive to litigate the issue of his intent to kill regardless of the significance of the special circumstance.

Moreover, the special circumstance finding would have collateral consequences in any future appeal or petition for writ of habeas corpus (e.g., by demonstrating the harmlessness of any trial error, see *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165) and could impact a future request for pardon or commutation from the Governor. We therefore disagree with Curiel that the significance of the special circumstance finding was "minimal" and it should not be given preclusive effect.[5]

---

[5]     Curiel suggests that contesting the intent to kill element would somehow have been inconsistent with his primary defense, which was that he was not guilty of murder because he

Relatedly, Curiel argues that the enactment of Senate Bill 1437 itself was such a significant and unforeseeable change in the law that it would be inequitable to apply issue preclusion to jury findings in his underlying trial. This argument is plainly foreclosed by our opinion in *Strong*: "[T]he structure of the statute — which permits trial courts to consult the record of conviction to determine whether the defendant has made out a prima facie case of eligibility [citation], and which notably does not open resentencing to every previously convicted murder defendant — strongly suggests the Legislature contemplated that many, and perhaps most, such findings would be given effect on resentencing." (*Strong*, *supra*, 13 Cal.5th at p. 715; accord, *Lewis*, *supra*, 11 Cal.5th at p. 971 [" 'if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner" ' "].) Indeed, it was undisputed in *Strong* that jury findings made under the current governing substantive legal standard (i.e., post-*Banks* and *Clark*) would "ordinarily establish a defendant's ineligibility for resentencing under Senate Bill 1437 and thus preclude the defendant from making

---

did not (1) aid and abet the underlying felonies of disturbing the peace or carrying a concealed firearm by a gang member or (2) aid and abet the murder itself. Even assuming any alleged inconsistency is relevant, Curiel is incorrect. Neither of these underlying theories involved intent to kill, so Curiel could have argued *both* that he was not guilty of murder *and* that he did not intend to kill Tejada. The tactical decision by Curiel's counsel to focus on the former does not create an exception to the doctrine of issue preclusion. (See *Sims*, *supra*, 32 Cal.3d at p. 484 [preclusion applied despite party's failure to present evidence].)

a prima facie case for relief." (*Strong*, at p. 710.) Senate Bill 1437 does not itself support an equitable exception to issue preclusion. To the contrary, issue preclusion will "ordinarily" apply in such proceedings. (*Strong*, at p. 710.)

### C. The Jury's Intent to Kill Finding

Although we conclude the jury's intent to kill finding should be given preclusive effect, it remains to be determined what that effect should be, i.e., how a trial court should apply the intent to kill finding in resentencing proceedings under section 1172.6. It is certainly relevant to the trial court's consideration of a petitioner's prima facie showing. "The record of conviction will necessarily inform the trial court's prima facie inquiry . . . , allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis*, *supra*, 11 Cal.5th at p. 971.) "Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citation.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid*.) Consequently, "[i]f the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*Strong*, *supra*, 13 Cal.5th at p. 708.)

The Attorney General contends the intent to kill finding is not only relevant, but dispositive, based on section 1172.6, subdivision (a)(3). That provision requires an otherwise-eligible petitioner to allege that he or she could not be convicted of the relevant homicide offense (here, murder) "because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3).) The Attorney General argues that the jury's intent to kill finding precludes a petitioner from making that allegation. We disagree. For reasons we explain, an intent to kill finding does not itself conclusively establish that a petitioner is ineligible for relief.

The Attorney General is correct that the allegation under section 1172.6, subdivision (a)(3) is part of the prima facie showing a petitioner must make in order to proceed to an evidentiary hearing. (§ 1172.6, subd. (c); *Lewis*, *supra*, 11 Cal.5th at p. 962.) While we have recognized this requirement, we have not previously explored its meaning. (*Lewis*, at p. 972, fn. 6 ["We are not asked to resolve what is substantively required under subdivision (a)(3)"].)

Our standard of review in this context is well-settled: "The proper interpretation of a statute is a question of law we review de novo. [Citations.] ' " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " ' [Citation.] ' "[W]e look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must

harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' " ' " (*Lewis*, *supra*, 11 Cal.5th at p. 961.)

The "changes" described in section 1172.6, subdivision (a)(3) plainly refer to the substantive amendments to sections 188 and 189 that were enacted along with the resentencing provisions in Senate Bill 1437. The amendments to section 189, concerning the felony-murder rule, are inapplicable here. But the amendments to section 188, concerning malice, form the basis for Curiel's resentencing petition. As noted, Senate Bill 1437 amended section 188 to include the requirement that, except in cases of felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3), added by Stats. 2018, ch. 1015, § 2.)

Because the amendment to section 188 specifically concerns malice, the Attorney General argues that the jury's finding of intent to kill (i.e., express malice) conclusively refutes Curiel's allegation that he could not currently be convicted of murder "because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3).) The Attorney General relies on the legislative history of Senate Bill 1437, which reflects the Legislature's concern with the perceived inequity of imposing murder liability on defendants who did not intend to kill. (See, e.g., Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1437 (2017–2018 Reg. Sess.) as amended May 25, 2018, pp. 4–5.) He also cites the uncodified preamble to Senate Bill 1437, which explains, "It is necessary to amend the felony murder rule and the natural and probable consequences

doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1(f).)

The Attorney General's position is unpersuasive. It reads section 188, subdivision (a)(3) in isolation, and it ignores the provision's broader effect on murder liability in California. That subdivision did not simply "add the element of malice aforethought" to existing theories of murder liability. (*Gentile*, *supra*, 10 Cal.5th at p. 849.) It eliminated the doctrine of natural and probable consequences in its entirety: "By limiting murder liability to those principals who personally acted with malice aforethought, section 188(a)(3) eliminates what was the core feature of natural and probable consequences murder liability: the absence of a requirement that the defendant personally possess malice aforethought. As a result, the most natural reading of Senate Bill 1437's operative language is that it eliminates natural and probable consequences liability for first and second degree murder." (*Ibid.*)

Thus, after the enactment of Senate Bill 1437, a defendant cannot be convicted of murder based on the doctrine of natural and probable consequences, even with a showing of malice aforethought. (*Gentile*, *supra*, 10 Cal.5th at p. 849.) It is an invalid theory. Murder liability requires a different, valid theory, such as direct aiding and abetting. (*Id.* at p. 850.) And it requires a different, valid theory *because of* the changes to section 188 in Senate Bill 1437. It was those changes that persuaded this court that the doctrine of natural and probable consequences could no longer support murder liability, with or without malice. (*Gentile*, at p. 849.) Consequently, a petitioner

who alleges that he or she could not currently be convicted of a homicide offense "because of changes to Section 188 or 189 made effective January 1, 2019" (§ 1172.6, subd. (a)(3)) puts at issue all elements of the offense under a valid theory.

The Legislature's focus on intent does not compel a different result. As discussed, the amendments to section 188 concerning malice had broader effects on the substantive law of murder than a narrow reading would suggest. The Legislature sought to limit murder liability to established theories that incorporated the requisite intent; it did not intend to impose an intent requirement untethered from existing theories of liability. (*Gentile, supra,* 10 Cal.5th at pp. 850–851.) And it sought to provide the opportunity to petition for relief to defendants who were convicted under an invalid theory like the natural and probable consequences doctrine at issue here. (See § 1172.6, subd. (a)(1).)

At the prima facie stage, a court must accept as true a petitioner's allegation that he or she could not currently be convicted of a homicide offense because of changes to Section 188 or 189 made effective January 1, 2019, unless the allegation is refuted by the record. (*Lewis*, *supra*, 11 Cal.5th at p. 971.) And this allegation is not refuted by the record unless the record conclusively establishes every element of the offense. If only *one* element of the offense is established by the record, the petitioner could still be correct that he or she could not currently be convicted of the relevant offense based on the absence of *other* elements.

This general principle applies to a finding of intent to kill. It is only one element. It does not by itself establish any valid theory of liability. (See *In re Lopez* (2023) 14 Cal.5th 562, 587

(*Lopez*).) For example, "under direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another [e.g., murder] if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'" (*Gentile, supra*, 10 Cal.5th at p. 843.) Similarly, to be liable for murder under a theory of implied malice, an aider and abettor must aid in the commission of a life-endangering act, with "'knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.'" (*People v. Reyes* (2023) 14 Cal.5th 981, 991 (*Reyes*), italics omitted.) A finding of intent to kill does not, standing alone, cover all of the required elements. It does not itself show that a petitioner like Curiel is liable for murder under any valid theory.

### D. The Jury's Other Findings

While a finding of intent to kill does not, itself, suffice to refute a petitioner's allegation under section 1172.6, subdivision (a)(3), a trial court does not end its prima facie inquiry there. Other aspects of the record, such as additional jury findings, might be relevant to the remaining elements of the relevant homicide offense and conclusively refute a petitioner's allegation that he or she could not be convicted of murder under current law. "The record of conviction will necessarily inform the trial court's prima facie inquiry under section [1172.6], allowing the court to distinguish petitions with potential merit from those that are clearly meritless. This is consistent with the statute's overall purpose: to ensure that murder culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be

efficiently addressed as part of a single-step prima facie review process." (*Lewis*, *supra*, 11 Cal.5th at p. 971.) " '[I]f the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid.*) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief . . . ." (*Id.* at p. 972.)

For example, in *Strong*, we concluded that pre-*Banks* and *Clark* special circumstance findings did not have preclusive effect in resentencing proceedings under section 1172.6. (*Strong*, *supra*, 13 Cal.5th at pp. 717–718.) But suppose the jury in such a case made findings on all of the other elements supporting felony murder under section 189 as amended, including (1) the commission or attempted commission of a felony enumerated in that statute and (2) the death of a person during the commission or attempted commission of the enumerated felony. In that case, if the jury additionally found intent to kill, it would "ordinarily be dispositive" because the jury's findings would conclusively establish all of the elements of felony murder under current law. (*Strong*, at p. 715; see § 189, subd. (e)(2).) Considered together, the jury's findings would completely refute a petitioner's allegation that he or she could not currently be convicted of murder because of changes to sections 188 and 189.

The Attorney General argues the same line of reasoning applies to this case. Curiel was not prosecuted under a theory of felony murder, and the underlying offenses here (disturbing the peace and carrying a concealed firearm by a gang member) are not among those enumerated in section 189. But, assuming

the jury relied on the then-available doctrine of natural and probable consequences to convict Curiel of murder as an aider and abettor, it necessarily made certain factual findings in order to reach its verdict of guilt. The Attorney General contends that those factual findings — combined with the jury's finding of intent to kill — cover all of the elements of murder under the theory of direct aiding and abetting and therefore preclude relief under section 1172.6.

As framed, this argument is analogous to one we considered recently in *Lopez, supra*, 14 Cal.5th 562. There, a defendant filed a petition for writ of habeas corpus alleging his jury was improperly instructed on the natural and probable consequences theory of aiding and abetting first degree murder. (*Id.* at p. 578; see *People v. Chiu* (2014) 59 Cal.4th 155, 158–159 (*Chiu*).) The Attorney General conceded the error but contended that it was harmless beyond a reasonable doubt based in part on the jury's factual findings, including its true finding on a gang-murder special circumstance. (*Lopez*, at pp. 579, 585.) The Attorney General argued these findings encompassed all of the elements of first degree murder under a valid theory of direct aiding and abetting. (*Id.* at p. 587.) To assess the Attorney General's contention, we examined the language of the court's jury instructions and compared them to the elements of murder under a valid theory. Following that examination, we concluded that "the relevant language evokes similar concepts" but "it does not cover all of the elements of direct aiding and abetting." (*Ibid.*)

Unlike *Lopez*, this matter is not governed by principles of harmless error. But, similar to *Lopez*, we may look to the jury's verdicts, and the factual findings they necessarily reflect, to determine whether the record of conviction refutes the factual

41

allegations in Curiel's petition. (See *Lewis*, *supra*, 11 Cal.5th at p. 971.) If the jury has made a factual finding, and it is issue preclusive under the principles described above, a court must give effect to that finding. (See *ibid*.) A court giving effect to such a finding does not engage in " 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id.* at p. 972.) It is simply "distinguish[ing] petitions with potential merit from those that are clearly meritless" based on findings already made by the jury. (*Id.* at p. 971; see *Strong*, *supra*, 13 Cal.5th at p. 710.)

Although the framework evoked by the Attorney General is valid, we cannot agree with his ultimate conclusion. For reasons we explain, the jury's verdicts do not reflect all of the factual findings necessary to support a murder conviction under current law. Thus, they do not refute Curiel's allegation that he could not be convicted of murder under sections 188 and 189 as amended, and they do not establish conclusively that Curiel is ineligible for relief.[6]

---

[6] In the harmless error context, " 'the reviewing court is not limited to a review of the verdict itself.' " (*Lopez*, *supra*, 14 Cal.5th at p. 588.) The court "may look to 'the entire cause, including the evidence.' " (*Id.* at p. 592.) "[T]his further harmlessness inquiry requires a reviewing court to 'examine[] what the jury necessarily did find and ask[] whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' [Citation.] In other words, a reviewing court must be persuaded that, in light of the jury's findings and the evidence at trial, any rational juror who made those findings would have made the additional findings necessary for a valid theory of liability, beyond a reasonable doubt, if the jury had been properly instructed. [Citation.] If the reviewing court determines beyond a reasonable doubt that

As noted, "under the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)." (*Gentile*, *supra*, 10 Cal.5th at p. 843.) The jury here was instructed on two underlying "target" offenses, disturbing the peace and carrying a concealed firearm by a gang member. To convict Curiel of murder under the natural and probable consequences doctrine, the jury was required to find that Curiel knew that the perpetrator (here, Hernandez) intended to commit the underlying crime; that Curiel intended to aid and abet the perpetrator in committing the crime; and that Curiel, by words or conduct, did, in fact, aid and abet the perpetrator's commission of the crime. In other words, Curiel must have known of the perpetrator's unlawful purpose and specifically intended to and did, in fact, "aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime."

Additionally, the jury was required to find that Hernandez committed murder during the commission of the crime of disturbing the peace or the crime of carrying a concealed firearm by a gang member, and that "under all the circumstances a

_____

any rational juror would have made the additional findings, based on the jury's actual verdict and the evidence at trial, the error is harmless because the presentation of the invalid theory to the jury made no difference. The error did not contribute to the verdict." (*Id*. at p. 589.) Because neither party attempts to apply these principles here, we have no occasion in this matter to examine how, or even whether, these principles might apply in the context of a section 1172.6 resentencing petition.

reasonable person in [Curiel's] position would have known that the commission of murder was a natural and probable consequence of the commission of the crime of disturbing the peace or of the crime of carrying a concealed firearm by a gang member." The jury was told, "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes."

The scope of criminal liability is defined by statute: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." (§ 31.)

In general, to establish liability for murder under the theory of direct aiding and abetting, "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu*, *supra*, 59 Cal.4th at p. 167.) In addition, as noted, an aider and abettor may be liable for murder under a theory of implied malice where the aider and abettor aids in the commission of a life-endangering act, with " 'knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes*, *supra*, 14 Cal.5th at p. 991, italics omitted.) "Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus — a crime committed by the direct perpetrator, (b) the aider and abettor's

mens rea" — which here includes knowledge that the direct perpetrator intends to commit the crime or life-endangering act, "and (c) the aider and abettor's actus reus — conduct by the aider and abettor that in fact assists the achievement of the crime." (*Perez*, *supra*, 35 Cal.4th at p. 1225.)

The jury found Curiel guilty of first degree murder and found true the gang-murder special circumstance, but it was not required to identify which theory it found persuasive. Assuming the jury relied on the then-available natural and probable consequences doctrine to convict Curiel of murder, the Court of Appeal below found the jury's factual findings insufficient under current law based on the absence of the last element of direct aiding and abetting, the aider and abettor's actus reus. The Attorney General responds that the jury must have found the requisite actus reus by Curiel based on his aiding one of the underlying target crimes (either disturbing the peace or carrying a concealed firearm by a gang member), of which murder was both an actual and a natural and probable consequence. In the Attorney General's view, based on the close causal relationship between the underlying crime and the murder, any act that aided or encouraged the underlying target crime must also as a factual matter have aided or encouraged the murder as well. He contends, "The actus reus under each theory entails, at a minimum, encouragement of, or participation in, some activity that foreseeably results in a homicide . . . ." For example, an aider and abettor who purchases a gun for a direct perpetrator could, by that act, be found to aid both the underlying offense of carrying a concealed firearm by a gang member *and* the offense of murder that results.

However, in order to find this element satisfied at the prima facie stage of section 1172.6 proceedings, we must be confident the jury *necessarily* found the actus reus required for direct aiding and abetting murder. That is, regardless of the facts, the jury must have made the required finding based on the instructions provided by the trial court. Although in many factual scenarios the Attorney General may be correct that the same act would satisfy the actus reus of aiding and abetting the underlying target crime and aiding and abetting the murder that results, we are unsure that the same act must necessarily satisfy each as a matter of law. Nonetheless, we need not decide whether the jury necessarily found the requisite actus reus because we conclude the jury did not necessarily find the requisite mens rea for direct aiding and abetting liability.

We have generally described the requisite mens rea for direct aiding and abetting as "knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends." (*Perez*, *supra*, 35 Cal.4th at p. 1225.) In other words, the aider and abettor must have "knowledge of the unlawful purpose of the perpetrator" and "the intent or purpose of committing, encouraging, or facilitating" the commission of the offense. (*Chiu*, *supra*, 59 Cal.4th at p. 167.) Alternatively, in the context of implied malice murder, the aider and abettor must know the perpetrator intends to commit a life-endangering act, intend to aid the perpetrator in the commission of that act, know the act is dangerous to human life, and act in conscious disregard for human life. (*Reyes*, *supra*, 14 Cal.5th at p. 991.)

Under the court's instructions, the jury was not required to make these findings. Because the jury was instructed on the natural and probable consequences doctrine, the jury was

46

required to find only that Curiel knew that Hernandez intended to commit one of the underlying target offenses and that Curiel intended to aid him in *that* offense, not murder. Nor was the jury required to find that the underlying target offenses, themselves, were dangerous to human life. While the jury separately found Curiel intended to kill, such an intent standing alone is insufficient to establish the requisite mens rea for aiding and abetting murder. The essence of aiding and abetting is involvement in the crime of another. The aider and abettor must become "concerned" with the crime itself. (§ 31.) "[A] person 'chooses to become a part of the criminal activity of another'" and "'says in essence, "your acts are my acts."'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*).) Although intent to kill is certainly blameworthy, it is insufficient standing alone to render a person culpable for another's acts. The aider and abettor must know the direct perpetrator intends to commit the murder or life-endangering act and intend to aid the direct perpetrator in its commission. It is this mental relationship to the perpetrator's acts that confers liability on the aider and abettor. (See *Chiu*, *supra*, 59 Cal.4th at p. 167; *Perez*, *supra*, 35 Cal.4th at p. 1225; see also *Reyes*, *supra*, 14 Cal.5th at pp. 991–992.) Indeed, even as it found the actus reus element lacking, the Court of Appeal below appears to have noted this shortcoming, explaining that the intent to kill finding "shed no light on whether Curiel actually *encouraged* or assisted the perpetrator in carrying out the murder." (Italics added.)

The Attorney General relies heavily on *McCoy* in this context, but it does not support a contrary conclusion. *McCoy* considered "whether an aider and abettor may be guilty of greater homicide-related offenses than those the actual

perpetrator committed." (*McCoy*, *supra*, 25 Cal.4th at p. 1114.) We determined that an aider and abettor could be liable for a greater offense, based on a more culpable mens rea. "Aider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea. If the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator." (*Id.* at p. 1120.)

This recognition, however, did not entail dispensing with the traditional mens rea required for aiding and abetting murder. We explained, "[W]hen a person, *with the mental state necessary for an aider and abettor*, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea. If that person's mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator." (*McCoy*, *supra*, 25 Cal.4th at p. 1122, italics added.)

*McCoy* discussed two examples, which figure prominently in the Attorney General's argument. First, we explained, " 'it is possible for a primary party negligently to kill another (and, thus, be guilty of involuntary manslaughter), while the secondary party is guilty of murder, because he encouraged the primary actor's negligent conduct, with the intent that it result in the victim's death.' " (*McCoy*, *supra*, 25 Cal.4th at p. 1119.) Second, we called to mind a well-known tragedy: "[A]ssume someone, let us call him Iago, falsely tells another person, whom we will call Othello, that Othello's wife, Desdemona, was having an affair, hoping that Othello would kill her in a fit of jealousy. Othello does so without Iago's further involvement. In that case,

depending on the exact circumstances of the killing, Othello might be guilty of manslaughter, rather than murder, on a heat of passion theory. Othello's guilt of manslaughter, however, should not limit Iago's guilt if his own culpability were greater. Iago should be liable for his own acts as well Othello's, which he induced and encouraged. But Iago's criminal liability, as Othello's, would be based on his own personal mens rea. If, as our hypothetical suggests, Iago acted with malice, he would be guilty of murder even if Othello, who did the actual killing, was not." (*Id.* at pp. 1121–1122.)

Critical to these examples is not only an intent to kill but knowledge and intent regarding the direct perpetrator's homicidal or life-endangering acts. The aider and abettor in the first example " 'encouraged the primary actor's negligent conduct.' " (*McCoy, supra,* 25 Cal.4th at p. 1119.) And Iago "induced and encouraged" Othello's murderous rage. (*Id.* at p. 1122.) Indeed, in applying our holding, we recognized in *McCoy* that the jury found the aider and abettor had "acted with the necessary mental state of an aider and abettor" and "knew of [the direct perpetrator's] unlawful purpose and intended to commit, encourage, or facilitate that purpose." (*Id.* at pp. 1122–1123.) The jury here was not required to make any similar findings encompassing Curiel's knowledge and intent regarding Hernandez's conduct.

As noted, the jury here must have found, under the natural and probable consequences doctrine, that Curiel knew that Hernandez intended to commit one of the underlying target offenses and also intended to aid him in that offense. The Attorney General argues this finding is sufficient because the underlying target offenses "foreseeably resulted in a homicide," thus closing the loop on Curiel's intent. But, as the Attorney

General elsewhere recognizes, *McCoy* requires the aider and abettor to actually foresee the homicidal or life-endangering consequences of the perpetrator's actions in this context. (*McCoy, supra,* 25 Cal.4th at p. 1118.) An aider and abettor who knows and intends to aid the direct perpetrator in certain conduct, but does not subjectively appreciate that the conduct is dangerous to human life, is not liable for the murder that results because the aider and abettor has not sufficiently concerned himself with that murder. This conclusion holds even if the aider and abettor separately intends to kill. Intent to kill itself does not establish a sufficient mens rea regarding a murder or life-endangering conduct that the aider and abettor has no intent to aid or encourage — and that the aider and abettor does not even subjectively know will occur. Indeed, a defendant could act with intent to kill but at the same time believe the actual perpetrator could never risk harm to another human being — and be genuinely surprised when the actual perpetrator commits a life-endangering act.[7]

We have characterized this scenario — where a defendant is liable for murder under the natural and probable consequences doctrine, and acts with malice aforethought, but is *not* liable as a direct aider and abettor — as "quite narrow" and relevant only to a "very small set of cases." (*Gentile, supra,* 10 Cal.5th at p. 850.) But the question is not whether it is *likely* a defendant could have felt and acted in such a way, but whether the court's jury instructions foreclose that possibility *as a matter*

---

[7] We emphasize that our discussion of the requisite mental state applies to the direct aiding and abetting theory of murder. The mental state required for felony murder is materially different, and we do not consider it here. (Cf. *Strong, supra,* 13 Cal.5th at pp. 704–705.)

*of law.* Only in the latter scenario would a trial court be permitted to deny a defendant's section 1172.6 petition at the prima facie stage. (*Lewis, supra,* 11 Cal.5th at p. 971.) In other words, only in that scenario would the record of conviction "establish conclusively that the defendant is ineligible for relief." (*Strong, supra,* 13 Cal.5th at p. 708.)

Contrary to the Attorney General's contention, this conclusion does not involve "litigat[ing] anew" any trial issues or allowing "a petitioner to challenge any aspect of the factfinding from the original trial that he or she wishes to revisit." We have already determined that the jury's factual findings should be given preclusive effect. The point here is to identify what those factual findings are and how they relate to the elements of murder under a valid theory.

Finally, we note that our holding today does not necessarily apply to other cases where the jury found intent to kill, or even other cases where the jury found true the gang-murder special circumstance. The jury instructions in other cases might be materially different, and they might therefore have required different factual findings by the jury. We hold only that under the jury instructions here, the findings the jury must have made are insufficient to conclusively establish that Curiel is liable for murder under current law. The jury could have relied on the natural and probable consequences doctrine to convict Curiel of murder, and the findings required under that theory — even when combined with the finding of intent to kill required by the gang-murder special circumstance — do not encompass all of the elements of any theory of murder under current law. These findings were therefore insufficient to rebut Curiel's allegation that he could not be convicted of murder under current law, and the trial court erred by denying Curiel's

petition for resentencing at the prima facie stage.  Although we do not consider the precise reasoning of the Court of Appeal, it was nonetheless correct to reverse the trial court's order.

### III.  CONCLUSION

We affirm the judgment of the Court of Appeal.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Curiel

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 11/4/21 – 4th Dist., Div. 3
**Rehearing Granted**

_____

**Opinion No.** S272238
**Date Filed:**  November 27, 2023

_____

**Court:**  Superior
**County:**  Orange
**Judge:**  Julian W. Bailey

_____

**Counsel:**

Nancy J. King, under appointment by the Court of Appeal, and Michelle May Peterson, under appointment by the Supreme Court, for Defendant and Appellant.

Mary K. McComb, State Public Defender, AJ Kutchins and Craig Buckser, Deputy State Public Defenders, for the Office of the State Public Defender as Amicus Curiae on behalf of Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorneys General, Michael Pulos, Seth M. Freidman, A. Natasha Cortina, Alan L. Amann and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michelle May Peterson
Attorney at Law
P.O. Box 387
Salem, MA 01970
(978) 594-1925

Lynne G. McGinnis
Deputy Attorney General
600 West Broadway
San Diego, CA 92101
(619) 738-9217