Filed 8/19/24  P. v. Davis CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062515 |
| v. | (Super. Ct. No. 96CF1766) |
| JASON RUSSELL DAVIS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Robert A. Knox, Judge.  Affirmed.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman and James Toohey, Deputy Attorneys General, for Plaintiff and Respondent.

Jason Russell Davis appeals from the denial of his Penal Code section 1172.6 petition, in which he sought the vacatur of his two 1998 attempted murder convictions.[1]  After issuing an order to show cause and conducting an evidentiary hearing, the court found beyond a reasonable doubt Davis aided and abetted the attempted murders and therefore was not entitled to relief.  Davis contends the court's ruling was not supported by substantial evidence.  We disagree and affirm.

PROCEDURAL HISTORY

In 1998, in a negotiated disposition, Davis pleaded guilty to two counts of attempted murder (§§ 664, subd. (a), 187, subd. (a)), a single count of first degree burglary (§§ 459, 460, subd. (a)), and a single count of second degree burglary (§§ 459, 460, subd. (b)).[2]  Pursuant to the plea agreement, the court imposed a 12-year prison sentence, dismissed the allegations the attempted murders were deliberate and premeditated, and dismissed the remaining charges.  The factual basis for Davis's plea, as relevant here, stated:  "On 6/16/96 in Orange County, I aided and abetted Manuel Martinez in attempting to murder two human beings (L. Marco and R. Ward)."

---

[1] All further statutory references are to the Penal Code.

[2] The burglaries Davis admitted committing were unrelated to the attempted murder charges and occurred on dates prior to the attempted murders.

2

In 2022, Davis filed a petition for resentencing pursuant to section 1172.6.[3] After briefing by the parties, the court found Davis made a prima facie showing of entitlement to relief and the court issued an order to show cause.

At the evidentiary hearing, the prosecution submitted the reporter's transcript of the 1997 preliminary hearing, wherein both attempted murder victims testified, and the prosecution requested the court consider all admissible evidence, non-hearsay testimony, and stipulated facts admitted at the preliminary hearing. The prosecution also requested the court take judicial notice of and admit into evidence: (1) the register of actions for the purpose of establishing the case's procedural history, sentence, and judgment; (2) the amended information; (3) Davis's 1998 plea form, which included the factual basis for his plea; and (4) the abstract of judgment. Davis testified at the evidentiary hearing. The court denied the petition, finding the evidence demonstrated beyond a reasonable doubt Davis aided and abetted the two attempted murders. Davis timely appealed from the court's decision.

_____

[3] Davis's petition references former section 1170.95, the predecessor to section 1172.6. Former section 1170.95 was renumbered section 1172.6 without substantive change in the text, effective June 30, 2022. (Stats. 2022, ch. 58, § 10.) Citations in this opinion are to the current version of the statute (§ 1172.6), unless otherwise noted.

When Davis filed his section 1172.6 petition, he had completed his 12-year sentence, but he was serving a 25-year-to-life sentence in a subsequent matter, in which his attempted murder convictions were used as prior "strikes" under the Three Strikes law. (§§ 667, subds. (b)–(i) & 1170.12.)

FACTS

At the evidentiary hearing, the court considered the reporter's transcript of Davis's 1997 preliminary hearing, at which Ward and Marco testified, and heard Davis's testimony.

I.

PROSECUTION'S EVIDENCE

A. *Introduction*

In June 1996, Ward and his girlfriend Marco lived in a condominium in the City of Orange. Ward had an exotic dancing business, and Marco was a dancer.

Martinez, Davis's codefendant, had known Ward for a few years. Martinez and Ward went to clubs and parties together. Martinez had worked as an independent contractor for Ward's business and was paid to chauffeur and protect the dancers, including Marco, at private shows. Ward and Martinez once argued after Martinez stole money from a customer of Ward's business, but they later reconciled and Ward permitted Martinez to work for him again. In early 1996, Ward was present when Martinez purchased a chrome .380 caliber handgun. Marco saw Martinez at Ward's office on occasion, but she did not socialize with Martinez.

Neither Ward nor Marco had met Davis prior to June 16, 1996.

B. *The Attempted Murders of Ward and Marco*

On the night of June 16, 1996, Marco went to bed about 8:00 p.m. and fell asleep soon thereafter. When she went to bed, Ward was the only other person in the residence.

Around 9:15 that evening, a female friend of Ward's visited him at the residence. Ward and his friend were watching television when Martinez arrived about 9:30 p.m. Martinez asked Ward to drive him and

4

Davis to a nearby location, where Martinez and Davis were going to pick up a stolen car and drive it to Riverside. Ward was to drive Davis's truck back to Ward's residence for them to retrieve later. Ward refused Martinez's request.

Martinez had been talking to Ward for about 10 minutes when Davis knocked on Ward's door. Martinez answered the door and stepped outside with Davis. Martinez reentered the residence a few minutes later. Martinez offered to give Ward money or methamphetamine if Ward went with him and Davis. Ward relented to Martinez's repeated requests and said he would do it for free.

Ward left the residence with Martinez. Ward's female friend departed in her own vehicle. Ward got into Davis's truck, sitting between Davis, who was driving, and Martinez. Davis drove to a dark street about a mile away and parked the truck. Martinez got out and appeared to be stretching, while Davis was looking around, checking their surroundings. After a few minutes, Martinez said he did not want to go through with his proposed plan because Ward was too nervous. On the drive back to Ward's condominium, Martinez tried to convince Ward to sell methamphetamine for him.

Upon returning, all three men went into Ward's residence. Davis made a telephone call to his girlfriend. Martinez brought methamphetamine and marijuana into Ward's residence. Ward, who had $2,300 in his freezer, was interested in buying some of Martinez's marijuana.

Ward walked into the kitchen to get Martinez a soda. When Ward grabbed the drink from the counter and turned around, Martinez stabbed him in the abdomen with a hunting knife. Davis was standing next to Martinez. Martinez did not say anything to Ward and did not answer when Ward asked why he was doing this. Davis appeared angry but did not

5

say anything.  Ward yelled for Marco, who was asleep in the bedroom.  Martinez ran to the bedroom.  Davis prevented Ward from pursuing Martinez.  Davis punched Ward in the face, shoved him into the living room, and pushed him to the floor.

In the bedroom, Martinez, who was wearing black gloves, stabbed Marco while she was sleeping and tried to strangle her.  In the living room, Davis told Ward to "shut up."  With Ward face down on the floor, Davis sat on top of him.  Davis grabbed some wire and wrapped it around Ward's neck.  He tightened the wire with one hand and used his other hand to pinch the front of Ward's neck.  Ward did not see where Davis got the wire, and he did not recognize it as something he had in his house.  Unable to breathe, Ward combatted Davis's efforts to strangle him.  During the struggle, Davis released the wire and repeatedly struck Ward in the back of the head with a closed fist.  When Ward started to get up, Davis tried to push him down.  Managing to break free from Davis, Ward ran to the alarm system in the hallway and hit the panic button.  Davis called out to Martinez, who reappeared from the bedroom.  Ward did not see Davis after that.

Martinez pulled a handgun from his waistband and pointed it at Ward.  Martinez shot Ward in the face as he said, "'Sorry, [Ward], I have to kill you now.'"  Shot in the left cheekbone, Ward ran toward Martinez.  The two men struggled for control of the gun; Ward prevailed.  Ward chased Martinez and tried to shoot him, but the gun jammed.

Ward ran to the bedroom with Martinez following close behind.  Ward tried to close the bedroom door but was unable to keep out Martinez.  Ward hit Martinez with the gun.  When Martinez moved toward Marco, who

was on the telephone with 9-1-1, Ward grabbed him and the two men fought.[4] While Martinez and Ward were fighting, Marco fled the room. Martinez started to pursue Marco. When Ward attempted to stop him, Martinez stabbed Ward in the neck with the knife. Ward lost his grasp on Martinez, and Martinez ran after Marco, with Ward following him.

Screaming for help, Marco ran through the condominium and outside toward a neighbor's residence. Before she reached the neighbor's, Martinez caught up to her, and grabbed her by the back of her shirt. He spun her around and punched her in the face with his fist. He then let go of her and ran away. She heard a gun discharge and a car drive away.

Ward collapsed outside. Ward and Marco were taken to the hospital and treated for their injuries.

## II.

### DAVIS'S TESTIMONY

In June 1996, Davis and Martinez were friends. They had committed burglaries together but not violent crimes. Prior to the night in question, Davis had not seen Martinez do anything violent. Davis had met Ward once before, when Davis was at a club with Martinez.

On June 16, 1996, Martinez called Davis and asked for a ride to Ward's. Martinez told Davis Ward said to come by and pick up some money Ward owed Martinez. When they arrived at Ward's condominium, Davis

---

[4] Marco remembered the altercation between Martinez and Ward in the bedroom differently. She testified that when Martinez was strangling her, Ward came into the bedroom, pulled him off her, and both men left the bedroom. While she was on the telephone to 9-1-1, Ward came back into the bedroom and tried to close the door to keep out Martinez. Marco testified Martinez had the handgun, reached in the doorway with it, and pointed it at her while she was on the telephone. After Martinez broke into the bedroom, Ward and Martinez struggled for control of the gun.

waited in his truck while Martinez went inside to talk to Ward. After waiting 20 minutes for Martinez to return, Davis knocked on the door to see if Martinez was going to be ready to leave soon. Martinez came out and spoke to Davis about a proposition Ward had to deliver some methamphetamine to Riverside in a stolen car. Davis agreed to "'check it out'" and the three men left in Davis's truck.

Martinez directed Davis where to go, and they stopped by a vehicle in a residential area a few blocks away. Martinez got out of the truck. Davis had a "weird vibe." Davis got out of the truck and told Martinez he did not want to be involved. Martinez said, "'That's fine,'" and the two men got back in the truck. Martinez told Ward they were not going to help him move the methamphetamine. Davis drove them back to Ward's condominium.

When they returned, Davis asked to use Ward's telephone to call his girlfriend and explain to her he would see her soon. Davis sat on the couch and called his girlfriend. After talking to her for a few minutes, Davis asked Martinez if he was ready to leave. Martinez said he was but asked Ward for a soda. Ward pointed to the dining area and said he left it there. Martinez requested Davis get the soda for him. Ward offered to get it instead and walked past Davis, into the kitchen. Martinez followed Ward into the kitchen, while Davis remained in the living room. Davis could not see what was happening in the kitchen but heard a scuffle. When he went to investigate, he saw Martinez and Ward fighting. Davis grabbed Ward and pulled him away from Martinez. Davis did not know Martinez had a knife and did not see him stab Ward.

Davis threw Ward down onto the living room floor. Davis held Ward there while trying to figure out what was going on. Ward fought Davis's efforts to restrain him. Davis grabbed speaker wire from a nearby

entertainment system and put it around Ward's neck to control him and hold him down. Davis did not know where Martinez was while he was wrestling with Ward. While Davis and Ward were fighting, Davis saw blood on Ward's shirt and realized Ward was hurt. He released the wire that was around Ward's neck. Ward got up, walked over to an alarm system on the wall, and activated it. Davis did not try to stop him. Davis yelled for Martinez and said, "'We gotta go.'" Martinez came from the hallway. Davis told him Ward "'hit the alarm,'" and Davis left the condominium.

Davis got into his truck and started driving out of the complex. He heard someone yelling at him, so he slowed down and stopped. Someone fired a gun at him. Martinez jumped into the truck, and Davis drove away.

Davis was unaware of any problems between Martinez and Ward. He did not see Martinez shoot or stab Ward. When driving Martinez to Ward's residence, Davis did not know Martinez was carrying gloves, a hunting knife, and a gun.

Davis denied he was trying to kill Ward when he put the wire around Ward's neck; he explained he only did it to hold Ward down while he tried to figure out what was happening.

Davis did not know Marco. He did not know Marco was there when they returned to the residence. He did not hear Ward call out to Marco after Martinez stabbed Ward. He did not suspect Martinez would attack Marco.

Davis was 19 years old when the incident occurred. Despite the passage of time, he remembered what happened that evening because it had a big impact on his life. He pleaded guilty to the two attempted murder charges because his attorney at the time told him that under the natural and

9

probable consequences theory he could be held liable for anything Martinez did.

## DISCUSSION

Davis contends the court's denial of his section 1172.6 petition was not supported by substantial evidence. We disagree. We conclude the court's findings Davis aided and abetted Martinez in the attempted murders of Ward and Marco are supported by substantial evidence.

### I.

#### STANDARD OF REVIEW

The denial of a section 1172.6 petition after an evidentiary hearing is reviewed for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988; *People v. Underwood* (2024) 99 Cal.App.5th 303, 313–314; *People v. Njoku* (2023) 95 Cal.App.5th 27, 43.) "Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.""" (*People v. Reyes, supra*, 14 Cal.5th at p. 988.)

"Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) ""If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also

reasonably be reconciled with a contrary finding.'" [Citation.] It is well settled that "'[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the [trier of fact's finding].'"'" (*People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233.)

## II.

### SECTION 1172.6

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015; Senate Bill 1437) amended the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).) It did this by amending section 188, which defines malice, and section 189, the felony-murder statute. (*Lewis*, at p. 959; *People v. Curiel* (2023) 15 Cal.5th 433, 448–449 (*Curiel*).) The Legislature also created a procedure in what is now section 1172.6 (former § 1170.95) that allows those previously convicted of felony murder or murder under the natural and probable consequences doctrine to obtain relief from their convictions if they could not be convicted of murder under the amended law. (*Curiel, supra*, 15 Cal.5th at p. 449; accord, *Lewis, supra*, 11 Cal.5th at p. 957.) Subsequently, the Legislature extended relief to defendants convicted of attempted murder under the natural and probable consequences doctrine. (Stats. 2021, ch. 551, § 2.) This legislation also codified aspects of the *Lewis* decision and clarified the burden of proof and procedure at the evidentiary hearing stage of the proceedings provided for in now section 1172.6. (Stats. 2021, ch. 551, § 1.)

The procedure begins when a defendant previously convicted of a qualifying offense files a petition for relief in the superior court. (§ 1172.6, subds. (a), (b)(1).) If a petitioner makes a prima facie showing for entitlement

11

to relief, the court must issue an order to show cause. (*Id.*, subd. (c); *People v. Strong* (2022) 13 Cal.5th 698, 708.) Unless the parties stipulate the petitioner is eligible for relief under the statute, the court must hold a hearing to determine whether the petitioner should be granted relief. (§ 1172.6, subd. (d)(1), (2).)

At the hearing, the prosecution bears the burden of proving beyond a reasonable doubt the petitioner is guilty of murder or attempted murder under the amended law. (§ 1172.6, subd. (d)(3).) Both parties may present "new or additional evidence to meet their respective burdens." (*Ibid.*) "[T]he court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (*Ibid.*) If the court finds beyond a reasonable doubt the petitioner is guilty of murder or attempted murder under a theory that remains valid after the amendments to sections 188 and 189, the petition is denied. However, "[i]f the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

III.

THE TRIAL COURT'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

In analyzing whether the court's decision is supported by substantial evidence, we focus on the elements of attempted murder and direct aiding and abetting principles. "To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) Direct aiding and abetting is a valid theory of liability for attempted murder after Senate Bill

12

1437's amendments to sections 188 and 189. (*People v. Coley* (2022) 77 Cal.App.5th 539, 548 ["Direct aiding and abetting remains a valid theory of attempted murder"]; cf. *Curiel, supra*, 15 Cal.5th at p. 462 [direct aiding and abetting is a valid theory for murder liability]; *People v. Gentile* (2020) 10 Cal.5th 830, 848 ["Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought"], superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)

"'[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another [e.g., [*attempted*] murder][5] if the accomplice aids the commission of that offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends."'" (*Curiel, supra*, 15 Cal.5th at p. 463.) "'Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea'—which here includes knowledge that the direct perpetrator intends to commit the crime . . . , 'and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.'" (*Id.* at p. 467.)

"[T]he mens rea required of a direct aider and abettor includes knowledge of the perpetrator's intent to commit an unlawful act constituting the offense and the intent to aid the perpetrator in its commission." (*Curiel, supra*, 15 Cal.5th at p. 441.) "'"When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this

_____

[5] Insertions added by this court are placed in brackets and italicized to distinguish them from the bracketed insertion appearing in the original material.

13

occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.'"'" (*In re Lopez* (2023) 14 Cal.5th 562, 585.) When the charge is attempted murder, "'the aider and abettor must know and share the murderous intent of the actual perpetrator.'" (*Ibid.*)

Here, the court's findings Davis was guilty of the attempted murders under a direct aiding and abetting theory are supported by substantial evidence that Davis knew Martinez intended to kill Ward and Marco, Davis intended to aid Martinez in committing those crimes, and Davis's conduct, in fact, aided Martinez's commission of those crimes. (See *Curiel, supra*, 15 Cal.5th at p. 467.)

Davis does not dispute the evidence proved Martinez attempted to kill Ward and Marco. But he contends the evidence did not prove beyond a reasonable doubt he intended to aid Martinez in trying to kill Ward or Marco. We conclude otherwise.

A. *There Is Substantial Evidence Davis Aided and Abetted the Attempted Murder of Ward*

Davis contends there was no evidence he knew Martinez planned to kill Ward. His argument is not persuasive. To a large degree, Davis's argument is based on his own testimony at the evidentiary hearing: his testimony he did not see Martinez stab Ward, and when he saw Ward fighting with Martinez, he grabbed Ward to protect Martinez but not with the intent of harming Ward. The court, however, found this portion of Davis's testimony not credible. We cannot lightly discount the court's credibility determination because "it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts

14

upon which [such] a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Under the substantial evidence standard of review, "[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*Ibid.*)

It is not difficult to find substantial evidence Davis aided and abetted Martinez in attempting to murder Ward. Ward testified Davis was standing in the kitchen next to Martinez when Martinez stabbed Ward with a hunting knife, and Davis had an angry expression on his face. When Ward called out to Marco, Davis took over the attack on Ward while Martinez ran to the bedroom and attempted to kill Marco. Davis punched Ward, shoved him into the living room, and forced him to the floor. Davis's actions after he had Ward on the floor demonstrate his intention to kill Ward and he was not simply pulling Ward away from a fight to protect Martinez, as he testified. Davis attempted to strangle Ward, using a wire and his hand. Although Davis let go of the wire at some point during the struggle, he continued the attack on Ward by repeatedly hitting him in the head. When Ward tried to get up, Davis pushed him back down. Davis's conduct aided Martinez's attempt to kill Ward.

From Davis's actions, we can readily infer he shared Martinez's intent to kill Ward. "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales, supra*, 7 Cal.5th at p. 602.) Here, Davis's actions are indicative of an intent to aid Martinez's efforts to kill Ward.

In his reply brief, Davis asserts the court found he did not intend to kill Ward, but only intended to do serious harm, and therefore the court's conclusion he aided and abetted the attempted murder of Ward cannot stand.

15

Discussing its ruling, the court stated: "I don't think the evidence is sufficient for finding that there was a direct intent to kill Mr. Ward simply because, as [the prosecutor] indicated, he changed his mind at some point." When viewed out of context, the court's statement is difficult to reconcile with its conclusion Davis aided and abetted Martinez in the attempted murder of Ward. However, when read in context, it is less concerning. The court's comment came after the parties argued the relevance of Davis's action of letting go of the wire. Davis's counsel argued it indicated Davis did not intend to kill Ward, while the prosecutor argued the attempted murder was complete by that point, even if Davis abandoned the plan by letting go of the wire. The court noted Davis strangled Ward with the wire and tried to crush or pinch the front of Davis's throat. The court stated, those actions "indicate an intent to do serious harm, if not to kill" and Davis would have understood his actions would kill a person if "done for a sufficient period of time." When the court's comments are reviewed in their entirety, it is clear the court found Davis aided and abetted the attempted murder of Ward, and this finding is supported by substantial evidence.

## B. There Is Substantial Evidence Davis Aided and Abetted the Attempted Murder of Marco

As to the attempted murder of Marco, the court found Davis knew Martinez intended to kill Marco because Martinez left the kitchen carrying the knife he had just used to stab Ward, as well as a handgun, and went to the bedroom when he learned Marco was in the residence. The court explained Davis's actions of subduing Ward aided Martinez in the attempted murder of Marco.

Davis contends the evidence is insufficient to support the court's finding he aided and abetted Martinez in attempting to kill Marco. His

16

argument focuses on the evidence he did not know Marco and did not see her the night Martinez attempted to kill her, as well as his own testimony he never heard Ward call out to Marco, he did not know she was in the residence, and he did not know where Martinez was while he was subduing Ward. He recognizes his actions "incidentally" (underline omitted) assisted Martinez in his attempt to kill Marco, but he asserts this is insufficient to prove he knew Martinez was going to try to kill Marco and that he engaged with Ward with the specific intent to aid Martinez in trying to kill Marco. The evidence and reasonable inferences drawn from it support the court's finding Davis aided and abetted Martinez's attempt to kill Marco.

It is reasonable to infer Davis knew Martinez planned to kill Marco when Martinez ran to the bedroom with a hunting knife after realizing she was in the residence. Davis had just witnessed Martinez use the knife to stab Ward in the kitchen. Davis did not idly stand by while Martinez ran to the bedroom to attack Marco. Davis instead tried to kill Ward while Martinez went to the bedroom and tried to kill Marco. Davis knew of Martinez's unlawful purpose and Davis intended to facilitate that purpose by preventing Ward from intervening in Martinez's effort to kill Marco. Davis's actions prevented Ward from alerting or helping Marco and facilitated Martinez's attempt to kill Marco. Thus, there is substantial evidence Davis knew Martinez intended to kill Marco when they learned she was in the residence, Davis intended to aid Martinez in this crime, and his actions did so.

The court's conclusion Davis is guilty of the attempted murders of Ward and Marco under a direct aiding and abetting theory is supported by substantial evidence.

## DISPOSITION

The postjudgment order denying Davis's section 1172.6 petition is affirmed.


MOTOIKE, J.

WE CONCUR:


GOETHALS, ACTING P. J.


GOODING, J.