Filed 2/14/25  P. v. Gutierrez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C101091 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F03952) |
| v. | |
| RICHARD GUTIERREZ, | |
| Defendant and Appellant. | |

Defendant Richard Gutierrez appeals from the trial court's denial of his petition for resentencing brought under Penal Code section 1172.6.  (Statutory section citations that follow are to the Penal Code unless stated otherwise.)  The trial court denied the petition without issuing an order to show cause or holding an evidentiary hearing.  It determined defendant was ineligible for relief as a matter of law because the record conclusively established that the jury found him guilty of willful, deliberate, and premeditated first degree murder.  We affirm the judgment.

1

FACTS AND HISTORY OF THE PROCEEDINGS

We restate the pertinent facts from our unpublished decision in *People v. Quintero* (Oct. 15, 2019, C086794 [2019 WL 5205978]) (*Quintero*) affirming defendant's judgment. We do not rely upon this factual summary in reaching our decision but instead provide it to give context to our discussion.

The case arose from separate shootings that occurred on June 13, 2015. Defendant and codefendant Martinez Quintero were charged for their involvement in the first shooting.

> "*The First Shooting*
>
> "Shortly after 5:00 a.m. on June 13, 2015, approximately 36 bullets were fired by multiple guns (at least four) at a two-story apartment complex located on Rio Linda Boulevard in Sacramento. One of the bullets struck Stacy Norman in the back, resulting in her death. Two other residents of the apartment complex suffered burns from bullets that dropped onto them from the ceiling. The evidence at the scene indicated that the gunshots were fired from the parking lot of the apartment complex and near the front entry of the complex. The evidence also indicated that some of the bullets were .38-caliber hollow-points, and that some of the bullets may have been fired by a high-powered rifle.[1]
>
> ". . . [A witness] was walking on Rio Linda Boulevard when she saw a black BMW with tinted windows and no license plates make two U-turns. The second time the car made a U-turn, its headlights were off. The car drove past her and parked on the street near the apartment complex located on Rio Linda

---

[1]    "At trial, the parties stipulated that Gutierrez was the person depicted in a photograph posted to his Facebook page on June 2, 2015. In that picture, Gutierrez is holding a firearm that had physical features consistent with an AR-15-style rifle or an M16- or M4-style rifle." (*Quintero,* fn. 3.)

Boulevard.  Three people got out of the car and walked toward the parking lot of that apartment complex.  Shortly thereafter, gunshots were fired.  When the shooting stopped, three people ran from the parking lot and got into the BMW. The car immediately drove off. . . .

"*The Second Shooting*

"Less than two minutes later, another shooting occurred about a mile away at the apartment complexes located on Beaumont Street (collectively, Beaumont Apartments).  Numerous bullets were fired by multiple guns.  The evidence at the scene indicated that gunshots had been fired at and from the two-story apartment complex located on the north side of Beaumont Street (building A), which shared a parking lot with the two-story apartment complex on the south side of Beaumont Street (building B).  One of the residents of Beaumont Street building B, Belinda G., was shot in her arm.

"Belinda G.'s son, George Halaway, lived in an upstairs apartment in Beaumont Street building A.  There were .40-caliber bullet casings found on the balcony and underneath the balcony in front of his apartment.  A black BMW belonged to one of Belinda G.'s sons or her nephew.  Halaway and his brother, Xavier, were among the people that drove the car.  Xavier lived with Belinda G.

"J.Q., [codefendant] Quintero's developmentally disabled brother, lived in Beaumont Street building B.  At times, Quintero, Gutierrez, and Joshua Smith stayed at J.Q.'s apartment and took care of him.  Smith was Quintero's friend and Gutierrez's godparent.  Smith considered Gutierrez to be family; he referred to Gutierrez as his little cousin or nephew.

"When Halaway was interviewed by the police, he talked about the events that occurred at his apartment complex in the late evening and early morning hours before his mother (i.e., Belinda G.) was shot.  Halaway explained that his cousin, Raymond Adams, had stopped by and said he had been 'jumped' by his

3

girlfriend's brothers. Adams asked Halaway for a gun because he and Quintero were considering 'going back over there' and doing a 'drive by.' Halaway told Adams that he was ' "stupid" ' for going to his girlfriend's house after she had been beaten up by a woman at Halaway's apartment complex a few days earlier.

"Halaway claimed that he did not give Adams a gun. However, he admitted that he went to Belinda G.'s apartment and retrieved a .40-caliber handgun for himself because he figured there was 'gonna be problems.'

"As Halaway was walking away from Adams, he heard Quintero say to Adams, ' "Are you ready?" ' Shortly thereafter, Halaway heard a car start up. At that point, Xavier (i.e., Halaway's brother) and a man named Rudy showed up. Xavier told Belinda G. to go upstairs to Halaway's apartment.

"When the shooting at the Beaumont Apartments started, Halaway, Belinda G., Xavier, and Rudy were on the balcony in front of Halaway's apartment. After Belinda G. was shot, someone at Halaway's apartment returned fire. Halaway estimated that the shooting occurred around an hour after Quintero and Adams left his apartment complex.

"[¶] . . . [¶]

"*Lydiana Gorostiza*

"Approximately two weeks later, the Sacramento Police Department was notified by authorities in Placer County that a woman named Lydiana Gorostiza had information about the shootings. Gorostiza had come to the attention of the authorities in Placer County after her ex-boyfriend, Warren Galsote, and Jason Benson were found dead on June 25, 2015. Galsote and Benson both had been shot in the head and set on fire.

"Gorostiza was interviewed by detectives with the Sacramento Police Department and testified at trial under a grant of immunity. During her testimony, Gorostiza explained that she had dated Galsote from February 2015 to mid-June

4

2015 and had met some of his friends, including his close friends Benson and Smith. Gorostiza further explained that Smith had introduced her to Gutierrez at J.Q.'s apartment, and that she had also met Quintero. On 'quite a few occasions,' Gorostiza saw Smith with a handgun; he carried a silver revolver or a bigger, black automatic handgun. She also saw Quintero with a small, automatic black handgun on three occasions, including the day of the shootings. When asked, Gorostiza said that Galsote made money by selling drugs—methamphetamine and opiates.

"Gorostiza gave the following account of the events surrounding the shootings: On two occasions prior to the day of the shootings, she and Galsote spent the night at J.Q.'s apartment. On one of those nights, Galsote, Smith, and Quintero talked about an altercation that had occurred the previous night. Smith explained that a woman who he had been drinking with got into a fight with a resident of J.Q.'s apartment complex. When several 'Paisas'—a term Gorostiza testified is slang used to refer to Mexicans from Mexico—came to pick the woman up, words were exchanged. According to Gorostiza, 'it didn't go so well' when this happened. In her police interview, which was played for the jury, Gorostiza explained that the woman was the girlfriend or ex-girlfriend of one of the Paisas who was a 'drug lord,' and that the woman had been beaten up during the altercation.

"Because Smith considered the Paisas to be a threat, he had Gorostiza purchase a box of .38-caliber hollow-point bullets for him. Gorostiza gave the bullets to Smith and then drove him to J.Q.'s apartment in her white Ford Expedition sport-utility vehicle (SUV). When Smith got out, he took the bullets with him.

"After Gutierrez facilitated the purchase of a black automatic handgun for Galsote from a man at a gas station, Galsote left a 'sack' of methamphetamine with Smith at J.Q.'s apartment and then went to San Jose with Gorostiza. . . .

5

"When Gorostiza and Galsote returned to Sacramento the following day, they picked Smith up and then drove toward J.Q.'s apartment complex. As they approached the complex, Gorostiza saw yellow tape around the fence and a police car parked out front. Gorostiza did not stop. Instead, she complied with Galsote's request to continue driving.

"Later that day, Gorostiza picked Gutierrez up from a house. Smith and Galsote were with her. Smith, who was nervous, very upset, and angry, repeatedly asked Gutierrez to tell him where his gun was. In response, Gutierrez said that he and Quintero had used the gun to 'shoot up' the Paisas's house on Rio Linda Boulevard but told Smith not to worry because the gun was getting 'cleaned.'. . .

"As Gorostiza was driving on Rio Linda Boulevard, she saw yellow tape around an apartment complex and police officers out front. Gutierrez and the other passengers instructed her to turn and go a different way. In response, Gorostiza pulled over, did a U-turn, and drove the opposite way.

"[¶] . . . [¶]

"Later that evening, Gorostiza, Galsote, and Quintero met up with Benson. . . . Around 3:30 a.m., Gorostiza, Galsote, and Quintero checked into a Motel 6. While they were at the motel, Quintero told Gorostiza that he had gone to the Paisas's place on Rio Linda Boulevard and shot it up. He described the shooting and indicated he was worried there might be witnesses. He talked about 'going down' for the shooting and said that '[h]e didn't care what was gonna happen to him.' Although Quintero indicated that at least one other person was with him during the shooting, he did not identify any other person that was involved in the shooting.

"[¶] . . . [¶]

6

"*Other Relevant Evidence Adduced at Trial*

"When J.Q. was interviewed by the police, he said that Quintero and 'Ricky' (presumably, Gutierrez) had problems with some Mexicans that lived nearby, and that they had left his apartment prior to the shooting at the Beaumont Apartments because of 'some problem' with the Mexicans.

"[¶] · · · [¶]

"The .38-caliber hollow-point bullets Gorostiza purchased for Smith matched six bullet casings found on the ground at the Rio Linda Boulevard apartments. Two expended .38-caliber hollow-point bullets found at the scene were determined to have been fired from the same gun that was used to kill Galsote and Benson. At the time of trial, Smith was charged with murdering Galsote and Benson. DNA evidence as well as cell phone and cell site evidence linked Smith to the murders." (*Quintero*, 2019 WL 5205978, fns. omitted except fn. 3.)

The jury found defendant guilty of first degree murder, willful and malicious discharge of a firearm at an inhabited dwelling, and possession of a firearm by a felon. (§§ 187, subd. (a) (count 1); 246 (count 2); 29800, subd. (a)(1) (count 3).) The jury also found true three firearm enhancements alleged with count 2: defendant personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm that proximately caused great bodily injury and death to Norman. (§ 12022.53, subds. (b), (c), (d).) The trial court found that defendant had a prior strike conviction. The court sentenced him to an aggregate state prison term of 50 years to life. (*Quintero*, 2019 WL 5205978.)

In 2019, we affirmed the judgment on appeal with the exception of striking two of the three firearm enhancements (§ 12022.53, subds. (b), (c)) and adjusting defendant's custody credits. (*Quintero*, 2019 WL 5205978.)

7

Defendant filed his petition for resentencing on March 22, 2023.  The trial court convened a prima facie hearing on March 29, 2024.  It began the hearing by stating, "I was the judge that presided over this trial.  I am extremely familiar with the facts of the case as well as what jury instructions I gave to the jury.  I'm also aware that Mr. Gutierrez was convicted of premeditated first degree murder."

After hearing counsels' arguments, the trial court ruled:

"Well, this defendant was convicted of first degree premeditated murder, so 1172.6 does not apply to this class of murder, and the jury instructions speak for themselves as to what I instructed this jury on and what the jury found.

"In addition, not to put too fine a point on it, but the jury also heard testimony, and if the Court of Appeal is interested, they can certainly read the trial transcript, but the jury had in front of it testimony wherein this defendant specifically admitted to using a gun to 'Shoot up the pisa's house on Rio Linda Boulevard,' which is the location in which the decedent was located when she was murdered.

"This is a co-defendant case.  Both defendants were convicted of the same crime.  I agree that [*People v. Langi* (2022) 73 Cal.App.5th 972] does not apply under these facts and under the verdict that was rendered in this case.

"So for all of those reasons, the defendant's motion pursuant to 1172.6 of the Penal Code is denied and he has not made his prima facie showing."

## DISCUSSION

Defendant contends the record, when properly considered at the prima facie stage, does not establish as a matter of law that he was the actual killer or a direct aider and abettor to murder.  He argues that even though the jury was not instructed on felony murder or the natural and probable consequences theory, he established a prima facie case for relief because under the instructions that were given, the jury could have imputed

8

malice to him based solely on his participation in the crime. Defendant also contends the trial court engaged in improper fact finding in denying his petition.

A. Legal background

Senate Bill No 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) narrowed or eliminated certain forms of accomplice liability for murder. (*People v. Curiel* (2023) 15 Cal.5th 433, 440 (*Curiel*).) It also created a procedure for convicted murderers who could not have been convicted under the revised law to retroactively seek relief. (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)

The *Curiel* court explained Senate Bill 1437 as follows: "The Legislature enacted Senate Bill 1437 'to more equitably sentence offenders in accordance with their involvement in homicides.' (Stats. 2018, ch. 1015, § 1(b).) The Legislature recognized, 'It is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability.' (*Id*., § 1(d).) With this purpose in mind, Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1(f).) Outside of the felony-murder rule, 'a conviction for murder requires that a person act with malice aforethought. A person's culpability for murder must be premised upon that person's own actions and subjective mens rea.' (*Id*., § 1(g).)

"Senate Bill 1437 altered the substantive law of murder in two areas. First, with certain exceptions, it narrowed the application of the felony-murder rule by adding section 189, subdivision (e) to the Penal Code. (Stat. 2018, ch. 1015, § 3.) Under that provision, 'A participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is

9

proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.'  (§ 189, subd. (e).)

"Second, Senate Bill 1437 imposed a new requirement that, except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder.  (§ 188, subd. (a)(3).)  'Malice shall not be imputed to a person based solely on his or her participation in a crime.'  (*Ibid*.)  One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine.  ([*People v.*] *Gentile* [(2020)] 10 Cal.5th [830,] 846 [(*Gentile*)].)  '[U]nder the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the "natural and probable consequence" of the crime the accomplice aided and abetted (i.e., the nontarget offense).  [Citation.]  A nontarget offense is the natural and probable consequence of a target offense "if, judged objectively, the [nontarget] offense was reasonably foreseeable."  [Citation.]  The accomplice need not actually foresee the nontarget offense.  "Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' " ' (*Id*. at pp. 843-844.)  Thus, under prior law, a defendant who aided and abetted an intended assault could be liable for murder, if the murder was the natural and probable consequence of the intended assault.  (*Id*. at p. 844.)  The defendant need not have intended the murder or even subjectively appreciated the natural and probable consequences of the intended crime.  (*Id*. at pp. 843-844.)  Senate Bill 1437 ended this form of liability for murder.  (*Gentile*, at p. 846.)

10

"Senate Bill 1437 also enacted former section 1170.95, which created a procedural mechanism 'for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief' where the two substantive changes described above affect a defendant's conviction. (*Gentile*, *supra*, 10 Cal.5th at p. 843.) . . . Two years later, the Legislature amended the statute to expand the population of eligible offenders, codify certain aspects of our decision in *Lewis*, and clarify the procedure and burden of proof at the evidentiary hearing stage of proceedings. (Stats. 2021, ch. 551, § 1.) One year after that, former section 1170.95 was renumbered as section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.) [Defendant filed his petition in 2023 after section 1172.6 was enacted.]

"Under section 1172.6, 'A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts . . . .' (§ 1172.6, subd. (a).)

" '[T]he process begins with the filing of a petition containing a declaration that all requirements for eligibility are met ([§ 1172.6], subd. (b)(1)(A)), including that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [Penal Code] Section 188 or 189 made effective January 1, 2019," the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3)).' ([*People v.*] *Strong* [(2022)] 13 Cal.5th [698,] 708 [(*Strong*)].) 'When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition "to determine whether the petitioner has made a prima facie case for relief." (§ 1172.6, subd. (c); [citation].) If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. (See § 1172.6,

subd. (c); [citation].) If, instead, the defendant has made a prima facie showing of entitlement to relief, "the court shall issue an order to show cause." (§ 1172.6, subd. (c).)' " (*Curiel, supra*, 15 Cal.5th at pp. 448-450.)

"The prima facie inquiry under section [1172.6] is 'limited.' (*Lewis, supra*, 11 Cal.5th at p. 971.) The court ' " 'takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause.' " ' (*Ibid.*) 'In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in "factfinding involving the weighing of evidence or the exercise of discretion." ' (*Id.* at p. 972.) '[T]he trial court should not decide unresolved factual issues[ ] that involve credibility determinations or weighing of evidence. Rather, it should decide such issues only after issuing an order to show cause and holding an evidentiary hearing.' (*People v. Duchine* (2021) 60 Cal.App.5th 798, 811-812, fn. omitted.)

"Nevertheless, the court may appropriately deny a petition at the prima facie stage if the petitioner is ineligible for relief *as a matter of law.* ' "[I]f the record, including the court's own documents, 'contain[s] facts refuting the allegations made in the petition,' then 'the court is justified in making a credibility determination adverse to the petitioner,' " ' thereby deeming the petitioner ineligible. (*Lewis, supra*, 11 Cal.5th at p. 971.) For example, if the record shows that the jury was not instructed on either the natural and probable consequences or felony-murder doctrines, then the petitioner is ineligible for relief as a matter of law." (*People v. Harden* (2022) 81 Cal.App.5th 45, 51-52 (*Harden*).)

The record of conviction may include admissible trial evidence, the trial court's instructions to the jury, the parties' closing arguments, and any factual findings made by the jury. (*Strong, supra*, 13 Cal.5th at p. 715; *People v. Ervin* (2021) 72 Cal.App.5th 90, 102.) The record may also include the underlying facts summarized in an appellate

12

opinion, but the opinion's factual summary cannot establish as a matter of law the defendant's ineligibility for resentencing at the prima facie stage. (*Ibid.*; *People v. Flores* (2022) 76 Cal.App.5th 974, 988.)

We independently review a trial court's determination on whether a petitioner has made a prima facie showing. (*Harden, supra*, 81 Cal.App.5th at p. 52.)

B.    Analysis

Defendant's jury was not instructed on the felony murder doctrine or the natural and probable consequences doctrine as it could pertain to murder. Because the jury was not instructed on either of those theories made invalid by Senate Bill 1437, defendant is ineligible for sentencing relief under section 1172.6 as a matter of law. (*Harden, supra*, 81 Cal.App.5th at p. 52; *People v. Offley* (2020) 48 Cal.App.5th 588, 599.) The only theory of first degree murder on which the jury was instructed was that defendant's killing of Norman was willful, deliberate, and premeditated. Because express malice murder was not invalidated or affected by Senate Bill 1437, defendant is ineligible for relief.

Defendant contends the instructions provided the jury a different path to convict him of murder. Relief is available under section 1172.6 where a defendant was convicted under any "other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a).) Defendant argues the jury could have convicted him of murder by imputing malice to him for his aiding and abetting Quintero and other unnamed participants in shooting at an occupied dwelling (count 2) that resulted in Norman's death.

Defendant primarily relies on CALCRIM No. 400 to make his argument. Given to the jury, that instruction states a person may be guilty of a crime either by directly committing the crime as the perpetrator or by aiding and abetting the perpetrator. The instruction as given to the jury also states: "Under some *specific* circumstances, if the

13

evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." (Italics added.) Defendant asserts that because CALCRIM No. 400 did not specify the crimes to which it applied, and because the jury was instructed with CALCRIM No. 401 on aiding and abetting, the jury could have found him guilty of murder based on finding he aided and abetted another person's shooting at an inhabited dwelling, the perpetrator killed Norman in the course of that felony, and the jury imputed malice to defendant.

The instructions, however, did not give the jury that option. The jury instructions ensured that the jury could find defendant guilty of first degree murder, even as an aider and abettor, only if it concluded he acted with the intent to kill. That was the only theory of first degree murder the prosecution pursued. Thus, to find defendant guilty of first degree murder, the jury necessarily found he acted with the intent to kill, not merely that murder was the natural and probable consequence of shooting at an inhabited dwelling or that somehow malice was imputed to him from that crime. (See *People v. Estrada* (2022) 77 Cal.App.5th 941, 945-946 (*Estrada*) [defendant ineligible for resentencing where record established jury convicted him of first degree murder as an aider and abettor with intent to kill].)

CALCRIM No. 400 did not give the jury a different path. That the instruction did not specify the circumstances under which defendant could be found guilty of other crimes did not mean the jury was free to decide what those circumstances were. Because the instructions did not specify when the jury could find defendant guilty of other crimes after aiding and abetting one crime, the jury was never given the option to find defendant guilty of other crimes. Nothing in the instructions stated or implied that the jury could find defendant guilty of first degree murder if it found him guilty of shooting at an inhabited dwelling or any other charged offense.

Certainly the instructions on the natural and probable consequences doctrine, CALCRIM Nos. 402 and 403, would have provided the jury a path to impute malice to

14

defendant. But the trial court did not give those instructions. Instructing with CALCRIM No. 400's reference to a defendant in some "specific circumstances" being guilty of other crimes that occurred during the commission of the first crime without also instructing on the natural and probable consequences doctrine does not constitute instructing on the natural and probable consequences theory. (*Estrada, supra*, 77 Cal.App.5th at p. 947, fn. 4.)

The general aiding and abetting instruction, CALCRIM No. 401, also did not allow the jury to find defendant guilty of first degree murder by aiding and abetting the shooting at a dwelling. That instruction applies when the prosecution attempts to prove that a defendant "is guilty of a crime based on aiding and abetting *that* crime." (CALCRIM No. 401, italics added.) Nothing in that instruction authorizes a jury to impute malice to commit a crime that is different than the crime the defendant aided and abetted. Where, as here, CALCRIM No. 401 is given along with CALCRIM No. 400 without instructing on the reasonable and probable consequences theory, there is no reasonable possibility that the jury could have imputed malice for first degree murder from the mental state of another shooter rather than find defendant guilty based on his own mental state in aiding and abetting the killing. (*Estrada, supra*, 77 Cal.App.5th at pp. 947-948.)

Defendant's reliance on *People v. Langi, supra*, 73 Cal.App.5th 972, 982-983 and *People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1259, is misplaced. Neither of those cases apply here because those decisions concerned implied malice murder, which does not require the jury to find an intent to kill.

Defendant is ineligible for relief because express malice murder was not invalidated or affected by Senate Bill 1437. Because we independently conclude defendant is ineligible for relief under section 1172.6, we do not address defendant's contention that the trial court erred by weighing facts.

DISPOSITION

The judgment is affirmed.

                                                    _____

                                                    HULL, Acting P. J.

We concur:

_____
DUARTE, J.

_____
WISEMAN, J.*

_____

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16