Filed 12/15/25  P. v. Morales CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH BRIAN MORALES,<br><br>    Defendant and Appellant. | 2d Crim. No. B342409<br>(Super. Ct. No. 1453737)<br>(Santa Barbara County) |

Joseph Brian Morales appeals from the trial court's order denying his petition for resentencing on his 2018 conviction for second degree murder.  (Pen. Code, § 1172.6.)[1]  He contends the trial court erred in denying his petition without an evidentiary hearing because the jury potentially convicted him on a theory of imputed malice as an "indirect aider and abettor."  We affirm.

---

1 All further statutory references are to the Penal Code.

*Facts and Procedural Background*

These facts are taken from our prior opinion in appellant's direct appeal and are provided for context only. (See *People v. Morales* (Jul. 15, 2020, B294448) [nonpub. opn.].)[2]

Appellant, a Northwest and Sureño criminal street gang member, was in charge of collecting taxes from drug dealers in Northwest's territory and "controlled the activities of the Northwest gang from within prison."

Gregorio Agustine, a member of the West Park criminal street gang, was "a shot caller for the whole [C]ounty of San Luis Obispo." He "collect[ed] taxes [from drug dealers] in different neighborhoods." The taxes were paid to "the big homies," i.e., members of the Mexican Mafia.

Agustine was a violent gang member. He had personally stabbed at least seven or eight people. He had been involved in "[a] lot" of shootings where he had "actually pulled the trigger." Agustine and appellant "got real close with phone calls." Appellant identified persons from whom Agustine could collect taxes.

*Agustine's Version of Events Leading to the Murder*

Agustine testified as follows: Appellant complained to Agustine that Javier Limon, the murder victim, "didn't want to pay taxes." Limon, who was selling drugs in Northwest gang territory, insisted that he was "paying taxes to Toto," a "big homie" from Long Beach. Appellant "found out somehow" that Limon was not paying taxes to Toto and that "he was using [Toto's] name in vain." Using a "big homie's" name in vain "can

_____

[2] We granted appellant's "Motion for Judicial Notice" of the prior record on appeal.

get you killed." Appellant said that Limon "was no good, that he thought [Limon] was an informant."

Appellant asked Agustine if he "could take care of it." Appellant said, "he really wanted [Limon] out, like whacked," and he "wanted [Agustine] to get rid of [Limon]." Agustine testified, "I know he wanted me to kill Javier Limon." But Agustine did not remember whether appellant had used the word "kill." Agustine believed that Limon was a Northwest gang member.

Agustine asked appellant, "'[H]ow come your people don't take care of it?'" Appellant replied, "'[M]y home boys, they ain't with it like that.'" Appellant said there were "orders from up there" to take care of Limon. Agustine understood that the orders had come from "the big homies" because Limon had used "Toto's name in vain."

Agustine "told [appellant he] would take care of it, kill Javier Limon." Appellant said that he would set up a drug transaction between Limon and Agustine. Appellant stated, "'[A]ct like you're going to make a transaction and whenever you see him, take care of it, you know.'"

On the day Limon was killed, appellant telephoned Agustine and said he had "'got ahold of [Limon].'" He gave Limon's phone number to Agustine. Agustine directed other gang members to use a fake drug transaction as a ruse for killing Limon.

*Limon's Cause of Death*

The cause of death was "multiple perforating and penetrating gunshot wounds." Limon was shot 10 times.

*Appellant's Testimony*

Appellant testified that Limon did not have to pay taxes to him because Limon was working for Toto, a "big homie."

3

"[T]here's never been a problem with [Limon] refusing to pay taxes." Appellant did not ask Agustine to harm, "take care of," or "get rid of" Limon.

*Prosecutor's Closing Argument and Jury Instructions*

The prosecutor's principle argument was that appellant acted with express malice because he had the intent to kill. Based on the evidence, the prosecutor argued that appellant "tells Agustine to kill [Limon], to take care of it. And he and Agustine agree to do it."

The prosecutor's alternative argument was the possibility of an unintentional murder based on implied malice. The prosecutor told the jury, "[I]f you believe [appellant] didn't have the intent to kill specifically, that he didn't make that specific order but rather just sent [Agustine] off to beat up Mr. Limon," then the jury should find appellant guilty of murder on an implied malice theory. The prosecutor argued that at the time appellant set Limon up to be checked, he knew it was dangerous to human life, and in doing so, he deliberately acted with conscious disregard for human life.

Before the instructions were given to the jury, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) was approved. (Stats. 2018, ch. 1015, § 1.) After discussing the legislative changes, the parties agreed to a modified version of CALCRIM No. 400, deleting the bracketed language on the basis that it would introduce the concept of natural and probable consequences.[3] The trial court gave the jury the standard

---

[3] As given, CALCRIM No. 400 instructed the jury as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and

4

instruction for aiding and abetting with respect to the intended crimes as set forth in CALCRIM No. 401. It also gave the standard instruction on murder with malice aforethought as set forth in CALCRIM No. 520. It did not instruct the jury with either CALCRIM Nos. 402 or 403, the instructions on natural and probable consequences doctrine.

The jury acquitted appellant of deliberate and premeditated first degree murder but convicted him of second degree murder. The jury found true two enhancement allegations, including that appellant committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)), and a principal discharged a firearm causing death (§ 12022.53, subds. (d), (e)). The trial court found true allegations that appellant had previously been convicted of a serious felony (§ 667, subd. (a)(1)) and a serious or violent felony within the meaning of California's "Three Strikes" law. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).) Appellant was sentenced to prison for 55 years to life "preceded by a five year determinate term" for the prior serious felony (§ 667, subd. (a)(1).)

We affirmed the judgment, concluding that there was sufficient evidence of express and implied malice to support appellant's second degree murder conviction. (*Morales*, *supra*, B294448.) We also rejected appellant's contention that the trial court should have instructed on the natural and probable consequences doctrine, explaining that "[t]he natural and

abetted a perpetrator, who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

5

probable consequences doctrine has nothing to do with the prosecutor's implied malice theory." (*Id*. at ** 10-12.)

*Section 1172.6 Petition for Resentencing*

In January 2022, appellant filed a form petition for resentencing pursuant to section 1172.6. The trial court appointed counsel, permitted briefing, and issued an order to show cause. The People filed a motion for reconsideration, which the trial court denied. After the parties submitted briefing on the merits, the People filed an updated motion for reconsideration.

The trial court granted the People's updated motion for reconsideration and denied appellant's petition for resentencing without an evidentiary hearing. As the trial court explained, the jury was not instructed on the natural and probable consequences doctrine, and no argument was made to the jury that appellant's intent could be imputed based on his participation in the crime. The trial court concluded that appellant was ineligible for resentencing as a matter of law.

*Senate Bill Nos. 1437 and 775*

Senate Bill 1437 amended the felony murder rule and the natural and probable consequences doctrine, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

To that end, Senate Bill 1437 amended section 188 by adding a requirement that, when the felony-murder rule does not apply, a principal in the crime of murder "shall act with malice aforethought" and "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

6

Senate Bill 1437 also enacted section 1172.6, which created a procedural mechanism for defendants who could not be convicted of murder or attempted murder under the amended laws to seek retroactive relief. (§ 1172.6, subd. (a)(3); *People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

Senate Bill No. 775 (2021-2022 Reg. Sess.) amended section 1172.6 to expand eligibility for resentencing to include not only those "convicted of felony murder or murder under the natural and probable consequences doctrine," but also those convicted of murder on any "other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a), as amended by Stats. 2021, ch. 551, § 2.) The amended statute also expanded the categories of offenses eligible for relief to include attempted murder and manslaughter. (*Ibid.*)

In determining whether a petitioner has made a prima facie showing for relief, the court ""takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved . . . ."" (*Lewis, supra*, 11 Cal.5th at p. 971.) The court may also rely on the record of conviction, including jury instructions and verdict forms. "'[T]he record of conviction will necessarily inform the trial court's prima facie inquiry . . ., allowing the court to distinguish petitions with potential merit from those that are clearly meritless.'" (*People v. Antonelli* (2025) 17 Cal.5th 719, 731; *People v. Curiel* (2023) 15 Cal.5th 433, 465 (*Curiel*) [courts may look to the jury's verdicts and factual findings they necessarily reflect].) "'If the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified

in making a credibility determination adverse to the petitioner.""" (*Lewis*, at p. 971.)

We independently review whether a petitioner has made a prima facie showing. (*People v. Harden* (2022) 81 Cal.App.5th 45, 52.) "[W]e may affirm a ruling that is correct in law on any ground." (*People v. Cortes* (2022) 75 Cal.App.5th 198, 204.)

*Discussion*

Appellant contends the trial court erred in rescinding the order to show cause because the record of conviction does not establish that he is ineligible as a matter of law. He acknowledges that the jury was not instructed on the natural and probable consequences doctrine but contends that theory may exist without the designated instruction. He contends the prosecutor "effectively" relied on a theory of "indirect aiding and abetting murder," which imputes malice. This contention is meritless.

Here, the prosecutor argued that appellant was "nothing less than an aider and abettor who intended to kill [Limon]." The prosecutor also argued that if the jury did not believe appellant had the specific intent to kill, he could still be found guilty of murder based on a theory of implied malice. That theory was that appellant committed an act (asking Agustine to beat up Limon) the natural and probable consequences of which were dangerous to life, (2) appellant knew this request endangered Limon's life, and (3) he acted with conscious disregard for life.

CALCRIM No. 520 identified the crime charged as murder and instructed that the defendant either committed an act that caused the death while he "unlawfully intended to kill," or "[h]e intentionally committed an act," "[t]he natural and probable consequences" of which "were dangerous to human life," "[a]t the

8

time he acted, he knew his act was dangerous to human life," and he "deliberately acted with conscious disregard for human life."

CALCRIM No. 401 instructed the jury that it must find that the aider and abettor "knew that the perpetrator intended to commit the crime," "intended to aid and abet the perpetrator in committing the crime," and "did in fact aid and abet the perpetrator's commission of the crime."

Viewing the instructions together as a whole and considering the prosecutor's argument that appellant was nothing less than a direct aider and abettor who acted with malice, there is no reasonable likelihood that the jury would have understood the instructions as permitting any imputation of malice. (See *People v. Allen* (2023) 97 Cal.App.5th 389, 397 [jury was not "reasonably likely" to impute malice given instructions in context]; *People v. Williams* (2022) 86 Cal.App.5th 1244, 1255-1256.)

Appellant disagrees. Relying on *People v. Powell* (2021) 63 Cal.App.5th 689 and *People v. Langi* (2022) 73 Cal.App.5th 972, he contends "[t]he detailed aider and abettor instructions set forth in CALCRIM [Nos.] 400 and . . . 401 did not state that to be guilty of murder, [appellant] had to aid and abet the actual perpetrator's commission of the life-endangering act, but merely referred to aiding and abetting 'a crime.'"

But *Langi* and *Powell* are distinguishable. The jury in *Powell* was instructed on the natural and probable consequences doctrine. And unlike in *Langi*, the only crime charged against appellant was murder. As our high court said in *People v. McCoy* (2001) 25 Cal.4th 1111, where the only unlawful purpose charged is an unlawful killing, "one cannot knowingly and intentionally

9

help another commit an unlawful killing without acting with malice." (*Id.*, at p. 1123.)

Appellant's reliance on *Curiel* is similarly misplaced because the jury there was also instructed on the natural and probable consequences doctrine. (*Curiel, supra*, 15 Cal.5th at p. 446.) Because the record of conviction conclusively establishes that appellant was at least convicted of aiding and abetting implied malice second degree murder, he is not entitled to relief as a matter of law. (See *id.*, at p. 463.)

*Disposition*

The order denying appellant's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:


BALTODANO, J.


CODY, J.


10

Stephen Dunkle, Judge

Superior Court County of Santa Barbara

_____

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee, Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.